[Crim. No. 1590. First Appellate District, Division Two.—January 15, 1931.]

THE PEOPLE, Respondent, v. L. L. BATEMAN, Appellant.

Frank P. Doherty, William R. Gallagher and H. A. I. Wolch for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

STURTEVANT, J.—The grand jury presented an indictment against L. L. Bateman, Raymond Bateman, James Arp, and W. C. Dorris. The indictment was framed in two counts. In the first count it was charged that the defendants conspired to commit the offense of receiving stolen goods. In the second count it was charged that the defendants committed the offense of receiving stolen goods. The defendants pleaded not guilty. A trial was had before the trial court sitting with a jury. The jury returned a verdict acquitting the defendant L. L. Bateman on the conspiracy charge, and it returned a verdict convicting him on the other charge. From a judgment entered on the verdict and from an order denying a motion for a new trial that defendant has appealed.

The transcript contains upwards of 1,000 pages. During the trial fifty or sixty witnesses were called and examined. Some of the witnesses gave evidence regarding acts and declarations of the alleged conspirators. Other witnesses testified to other facts and circumstances, but the defendant does not claim that the trial court erred in ruling on the admission of evidence or in giving instructions.

The defendant claims the trial court had no jurisdiction because the property was not *received* in San Fran-

cisco. The defendant states that "(a) A person charged must receive or buy the property; (b) he must know that the property was stolen; (c) the purpose or intent to prevent the owner from again possessing the property, or for the receiver's own gain must also exist." (*State* v. *Pray*, 30 Nev. 206 [94 Pac. 218, 221].) He then asserts that the jurisdiction of the charge rests in the court of the place where the property was received (*People* v. *Zimmer*, 174 App. Div. 470 [160 N. Y. Supp. 459]; 16 C. J. 168, sec. 214). We do not understand the prosecution to dispute any one of these claims except as to the correctness of the facts on which they are based. It is an admitted fact that the property was stolen from the owner in San Francisco June 1, 1929. This defendant and W. T. Davis both came from Bakersfield to San Francisco and on July 2, 1929, they occupied adjoining rooms at Hotel Holland. On July 17, 1929, Ray Bateman telegraphed $2,300 to L. L. Bateman at San Francisco and the draft was paid on the same day. Early in July the jewelry was in Bakersfield and was from time to time either as a lot, or piece by piece, exhibited as in the hands of W. T. Davis, James Arp, Ray Bateman or others. Each one attempted to make sales of the articles. In Ray Bateman's restaurant in October, 1929, the defendant, L. L. Bateman, his son Ray, Dorris, and Smith were having breakfast. Dorris said to the defendant: "It looks like you will have to make another trip to Chicago, and if you do, take the string along, you can raise more money on that than anything we have got." Later, on January 21, 1930, Jackson and Tatham, detective sergeants on the police force in San Francisco, went to Bakersfield and called at the house of Ray Bateman, the son of this defendant. When they were admitted to the house Mrs. Bateman had on her finger a guard ring set with many diamonds. That ring had been reset by order of Ray Bateman and had one more diamond thereon than the guard ring which had been stolen from Mrs. Dinkelspiel. The detectives took possession of it, gave Mrs. Bateman a receipt therefor, and left to call on Ray Bateman. When Tatham called on Ray Bateman he told the latter that he had just got the ring from Mrs. Bateman and that the ring had been stolen in a burglary in San Francisco. Ray Bateman made an appointment for Tatham to see the defendant. When Tatham

went to the house of L. L. Bateman, detectives Jackson and Kays and Shannon of the Bakersfield police force accompanied him. As they approached the house the screen door was locked. Attorney Dorris, who was inside with the defendant, asked if they had a warrant. Tatham said no. Then Dorris started to curse and threaten them. The defendant interrupted saying "Let me at 'em; I will put nine bullets into the sons of bitches; they pulled that Hoosier on the little girl." After that incident Mrs. Wells acted as a go-between. Tatham wrote on a paper a statement that if Mrs. Wells was allowed to take the jewelry to Lloyd's appraiser, and if a satisfactory arrangement was not made, Mrs. Wells could return the jewelry and would not be arrested. In one conversation the defendant asked her to make an appointment with the detectives to take the jewelry to San Francisco, saying, at the same time "I paid my money for this jewelry I bought it legitimately, and I want my money out of it." Such arrangements were made by the defendant, his son, and James Arp that the defendant and Mrs. Wells came to San Francisco. Arp shipped the jewelry by express to J. M. Sullivan. The defendant brought Mrs. Wells north, he driving a Chevrolet coupe. He took her to the house of one of his lady friends in Oakland. The next morning he called and took her to San Francisco. On arriving there he told her that he had had the jewelry forwarded by express. He asked her to go at once to see Lloyd's appraiser and then to come back to him. She did so and reported to the defendant. He then gave her the box of jewelry and told her to take it to the appraiser who would pay her $3,800 for it. Otherwise it was to be returned. Later she reported to the defendant what the appraiser said he would pay. The defendant told her to tell the appraiser to go to hell and directed her to get the jewelry and return it to him. As a part of the same conversation the defendant stated to Mrs. Wells "It was Ray's money, he will have to be the loser. I did not have anything in it myself." Later she was instructed to collect $2,000 if she could, but otherwise to bring the jewelry back. She attempted to do so, but, as she came out of the store, she was arrested. The jewelry had been forwarded to San Francisco in a package from James Arp. It was addressed to J. M. Sullivan. When Mrs. Wells was released

from jail Mr. Sullivan was present, was introduced to her by the defendant, and presented a wrist watch to her.

At the time of the trial Wm. Davis was dead. J. M. Sullivan was not called as a witness. Ray Bateman testified that in the latter part of July, 1929, W. T. Davis brought the jewelry and put it in witness' safe. Afterward witness loaned him over $2,000. In the last part of October he was given possession of the jewelry by W. T. Davis who said the witness could sell it and repay himself for the moneys borrowed and account to Davis for the balance of the moneys received from sales. The witness had the guard ring made over, an additional diamond put in and gave it to his wife. In December, 1929, he traded to Arp one bracelet, one pendant watch, one string of pearls, and one jade ring. Arp testified to about the same facts regarding his trade. But he also testified that about the first of July, 1929, Wm. Davis approached him and tried to sell him some of the stolen jewelry. When Tatham and Jackson were in Bakersfield, it does not appear that any single piece of the jewelry was in the possession of the defendant. However, such agreements were made that it was arranged that the defendant and Mrs. Wells were to go, and did go, to San Francisco and that Arp and Ray Bateman were to send, and they did send, all of the jewelry to J. M. Sullivan to be turned over to, and it was turned over to, the defendant in San Francisco. It is clear that there was some cirsumstantial evidence that about July 1, 1929, the defendant and Davis bought the jewelry in San Francisco. However, there was the further showing that both disposed of their interests. Later the defendant, acting for himself or for himself and others, on January 27, 1930, at San Francisco, received the stolen property. He then knew it was stolen property. He received it for the purpose of the gain of himself or of himself and those others. These facts covered all of the elements of the offense. (Pen. Code, sec. 496; *Ellison* v. *Commonwealth,* 190 Ky. 305 [227 S. W. 458, 461, 462].)

In other words the case at bar is not a case in which stolen goods have been unlawfully received by one who then takes them to another place for the purpose of selling them. (*People* v. *Zimmer,* 174 App. Div. 470 [160 N. Y. Supp. 459].) It is not so simple in its facts. There is some evi-

dence that the defendant received the stolen goods as early as the first day of July, 1929, but he then disposed of them. Later, being pressed with criminal proceedings, he negotiated for and did again receive the same goods for the same unlawful purpose. The uncontradicted evidence is that he so received the goods in San Francisco.

The defendant claims that in the absence of evidence of a conspiracy, statements or conversations by third persons out of the presence of the defendant and not a part of the *res gestae* are inadmissible. Conceding that such is a correct statement of the law, the point is not presented by the facts in the record. Here there was some evidence of a conspiracy, and the rule contended for has no application. The issue of conspiracy was present at all times until the jury brought in a verdict of not guilty as to the count charging conspiracy. Hence, evidence on that subject was admissible. When instructing the jury the court gave an instruction which limited the use the jury might make of the evidence of declarations and acts of the alleged conspirators. Hence there was nothing on which the defendant may predicate error on the part of the trial court in admitting the evidence.

In this connection the defendant claims the verdict was contrary to the evidence. The point rests on the fact that the defendant was acquitted on the count charging conspiracy and the defendant asserts that there is no evidence in the record proving the other count. This contention assumes there is no other evidence in the record. We think that there is and hereinabove we have stated some of that evidence. But the real point of the defendant is this. He complains that perchance the jury used and acted on the declarations of the alleged conspirators for purposes other than those stated in the instructions of the court. The record does not show that the jury did so. In the absence of some showing to the contrary we are bound to assume the jury followed the instructions given by the court.

Much of the evidence given during the trial was given by Mrs. Wells. Some statements were made in the briefs to the effect that she was an accomplice. Whether she was or was not an accomplice we need not pause to determine. Hereinabove we have set forth evidence which fully

complies with the rules concerning the corroboration of an accomplice.

We find no error in the record. The judgment and order appealed from are . affirmed.

Nourse, P. J., and Spence, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on January 30, 1931, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on February 9, 1931.