[Crim. No. 2981.   First Dist., Div. One.   Aug. 23, 1954.]

THE PEOPLE, Respondent, v. HARRY SHERMAN et al., Defendants; RICHARD R. FONG, Appellant.

Robert H. Kroninger and Leo A. Sullivan for Appellant.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Charles E. McClung, Deputy Attorney General, J. F. Coakley, District Attorney (Alameda), and Albert E. Hederman, Jr., Deputy District Attorney, for Respondent.

BRAY, J.—Defendant Fong appeals from his conviction of one count of conspiracy to commit abortion and one count of abortion, and from the order denying a new trial.

### QUESTIONS PRESENTED

1. Sufficiency of the evidence.  2. Refusal to set aside the indictment as to counts 2 and 3.  3. Alleged errors in the

admission of evidence. 4. Refusal to grant mistrial. 5. Instructions. 6. Alleged misconduct of district attorney.

## RECORD

Defendants Fong, Sherman, Ostrofsky, and Kirkpatrick were indicted jointly on four counts: (1) conspiracy to perform abortions on certain women including Mrs. Wallace and other women unknown; (2) performing an abortion on Mrs. Wallace; (3) performing an abortion on Miss Hosmer; (4) performing an abortion on Mrs. Alexander. At the opening of the trial the three defendants other than Fong pleaded guilty to all four counts.* Defendant was convicted of counts 1 and 4 and acquitted of counts 2 and 3.

### 1. *Sufficiency of Evidence.*

Defendant contends that as he was acquitted on counts 2 and 3 (Wallace and Hosmer abortions) and there was not sufficient evidence to support his conviction on count 4 (Alexander abortion) the case as to count 1 (the conspiracy charge) falls under the rule of *In re Johnston,* 3 Cal.2d 32 [43 P.2d 541], and *Oliver* v. *Superior Court,* 92 Cal.App. 94 [267 P. 764]. However, that rule does not apply here, first, because, as will hereafter appear, there was evidence to support the conviction on count 4, and secondly, the rule of the Johnston and Oliver cases is that a conviction for conspiracy cannot stand only if the overt acts charged in the conspiracy count are identical with the specific crimes alleged in other counts and the defendant is acquitted of those specific crimes. Here, the overt acts charged specifically mentioning defendant Fong were that he examined and treated Wallace and Hosmer. He was acquitted of the direct charges of abortions upon them. The overt acts charged were not the same as the substantive charges of abortions performed on the same women. As said in *People* v. *Robinson,* 43 Cal.2d 132, 138 [271 P.2d 865], ". . . where there are overt acts alleged in the conspiracy count in addition to those constituting the substantive offense, there may be a conviction of conspiracy and an acquittal of the substantive offense." There were charged six other overt acts in which defendant was not mentioned. None of them charged substantive crimes. "The overt acts need not be in themselves criminal in nature so long as they are done in pursuance of the conspiracy. . . .

---

*In view of that fact defendant Fong will be hereafter referred to as "defendant."

Nor is it necessary . . . that each conspirator perform some overt act. It is sufficient if one conspirator commits an overt act in carrying out the purpose of the conspiracy, for all the members thereof 'are bound by all acts of all members done in furtherance of the agreed plot.' '' (*Idem*, pp. 139-140.)

The evidence is amply sufficient to support defendant's conviction. It is unnecessary to detail all the evidence in the case, except that part dealing with defendant's connection.

Kirkpatrick, a locomotive fireman, during the war had served as a pharmacist's mate and done some reading and study of medical books. Sherman owned a pharmacy in Oakland, and Ostrofsky, a pharmacist, was employed there. Kirkpatrick in 1951 became acquainted with them, frequently visiting the pharmacy. In August or September, 1952, Kirkpatrick offered to commit abortions and Ostrofsky agreed to ''supply the women.'' The fees were to be divided evenly and Ostrofsky's half was to be divided with Sherman. It was decided that Kirkpatrick would use the name Dr. Burke or Don Burke. In October Mr. and Mrs. Wallace came to the Sherman Pharmacy seeking an abortion for Mrs. Wallace. After three unsuccessful hypodermic shots, Kirkpatrick was sent to see Mrs. Wallace. Kirkpatrick performed an abortion on her for which he was paid $250 by Mr. Wallace. In late October after meeting with the Wallaces but before committing the abortion, Kirkpatrick met defendant, who is a licensed medical doctor. The meeting with defendant grew out of a discussion between Kirkpatrick and Ostrofsky to the effect that it would ''be a lot safer'' if a physician was procured to give the women preoperative and postoperative care. Kirkpatrick met defendant in the latter's office, introducing himself as Don Burke and a friend of Ostrofsky's. Kirkpatrick testified that there was no discussion of abortions at this first meeting. Defendant, however, in a statement made in the district attorney's office stated that Kirkpatrick told him that he was sent to defendant by Sherman's Pharmacy, that he was the doctor doing abortions and he had come to get acquainted with defendant. Kirkpatrick testified that at a second meeting with defendant the latter agreed to give the women Kirkpatrick would direct to him preoperative and postoperative treatment. After committing the abortion on Mrs. Wallace Kirkpatrick wrote defendant's name and phone number on a piece of paper and told her to call defendant in case of emergency. Mrs. Wallace became quite ill and was treated by defendant. She was eventually hospitalized, and after several periods

of hospitalization and treatment, died. The evidence is not clear as to what was the cause of death.

In late October, upon being given her name and phone number by Ostrofsky, Kirkpatrick contacted Hosmer. He told her to go see defendant for an examination. Defendant examined her and charged her $10. That evening Kirkpatrick performed an abortion on her. The agreed price was $300, but Kirkpatrick credited the $10 charged by defendant. Hosmer saw defendant two days later. He made a perfunctory examination, told her she had lost the baby and gave her a shot, saying she was anemic. Defendant sent her a bill for this visit, but it was never paid.

About October 25th, Alexander, a patient of defendant's, asked him about having an abortion. Defendant stated that under the law he could not do anything for her. About a week later Kirkpatrick phoned her asking if she needed help. He later performed an abortion on her. In his statement at the district attorney's office defendant stated he had given Alexander's name to the Sherman Pharmacy as one wanting an abortion, and he had learned indirectly that that pharmacy had some contact through which abortions could be obtained. Alexander went to defendant for postoperative treatment. Kirkpatrick testified concerning Alexander that either Sherman or Ostrofsky told him to come down to the drugstore, saying "I think Fong has one for us . . . finally has one for us."

When Mrs. Wallace became ill after her abortion Mr. Wallace called defendant stating he wanted back the money he had paid Kirkpatrick. Defendant said that while it was not his to give he would see what he could do. (Defendant at no time received any part of the abortion fees. Kirkpatrick testified that defendant stated he would receive patients through this association.) Defendant had a mutual friend, one Lew, contact Kirkpatrick and tell him that Mrs. Wallace was ill and hospitalized and that Mr. Wallace was demanding his money back. After repeated demands by Mr. Wallace on defendant, Mr. Wallace received by mail a cashier's check for $250. No one would admit to purchasing the check. It was purchased in the name of "Don Burke," but Kirkpatrick denied purchasing it or that he had ever lived at the address mentioned on the application for it. Mr. Wallace testified that defendant was the only person he ever contacted in his effort to get his money back.

Late in December, 1952, or early in January, 1953, defendant went to see Hosmer at her apartment and tried to get her to sign a card stating that he had treated her for anemia only. She refused. Later, a typewritten letter on what appeared to be defendant's stationery was left in her mail box. The letter stated in effect that defendant had treated her for anemia only. A similar procedure was gone through by defendant with Mrs. Wallace and Alexander.

In his statement at the district attorney's office, defendant admitted knowing that Kirkpatrick in partnership with Ostrofsky and Sherman was performing abortions, and admitted that he had referred two or three persons desiring abortions to the pharmacy. He further admitted examining two of the above mentioned women prior to their abortions and treating the three of them afterwards, and that he had tried to get Hosmer to sign the card above mentioned.

Defendant apparently takes the position that because he had refused to join with Kirkpatrick in performing the abortions or directly associate with him and had not received any of the fees paid for the abortions, the evidence is insufficient to convict him of either the conspiracy or the substantive Alexander abortion charges. He contends that the most that can be said of him is that he had knowledge that a crime had been or was being committed and that as stated in *People* v. *Weber*, 84 Cal.App.2d 126, 130 [190 P.2d 46], mere knowledge alone is not enough to support a conviction. ██ But the evidence shows that he actually participated in the crimes. Among other acts are the following: (1) Kirkpatrick testified that defendant, aware of the conspiracy, agreed to furnish preoperative and postoperative care, and that when Kirkpatrick explained to defendant the method of aborting used by Kirkpatrick, defendant said it was "as good as any." (2) As above set forth, defendant admitted giving preoperative and postoperative care. The women involved testified to this care. (3) Wallace contacted defendant to get his money back. Defendant admitted phoning both Ostrofsky and Sherman to the effect that Mr. Wallace was frantic and wanted his money back, and contacting a friend to have the latter tell Kirkpatrick that he should give it back. (4) Alexander told defendant that she wanted an abortion and was shortly contacted by Kirkpatrick. Defendant admitted sending Alexander and two or three other women desiring abortions to the Sherman Pharmacy. (5) Defendant admitted contacting Hosmer and Alexander to get them to sign state-

ments that he had treated them for anemia only. This active participation in the conspiracy and in the substantive Alexander abortion distinguishes this case from *People* v. *Zoffel*, 35 Cal.App.2d 215 [95 P.2d 160], relied upon by defendant, and in which it was held that the evidence did not connect the defendant with the crimes charged. It is significant that although defendant in the presence of his counsel gave a long statement of his activities he did not take the stand at the trial. The evidence clearly shows that defendant aided and abetted the abortion on Alexander. (See *People* v. *Lewis*, 113 Cal.App.2d 468 [248 P.2d 461]; *People* v. *Wood*, 56 Cal.App. 431 [205 P. 698].)

2. *Testimony Before Grand Jury.*

Defendant made timely motion in the trial court to dismiss the indictment under the provisions of section 995, Penal Code, on the ground of lack of probable cause. He now contends that the denial of that motion was erroneous as it relates to counts 2 (Mrs. Wallace) and 3 (Hosmer). ■ As he has been acquitted upon both of these counts, such ruling, if erroneous, could not be prejudicial. The evidence concerning both the Wallace and Hosmer abortions would have been admissible under the conspiracy charge even though no substantive charges were added. It should be pointed out that, prior to trial, defendant and Sherman sought a writ of prohibition in this court to prohibit the trial of the action on the same ground. At that time, we examined the proceedings before the grand jury and found them to be sufficient to show probable cause. We have again examined those proceedings and find them sufficient.

3. *Alleged Errors.*

■ (a) Evidence concerning acts and declarations of the coconspirators occurring prior to defendant's entry into the conspiracy. That such is admissible is well established. ". . . having joined the conspiracy after it was formed, and having actively participated in it, appellant thereby adopted the previous acts and declarations of his fellow conspirators, and evidence of such acts and declarations was admissible against him even though there was no direct evidence that he had any knowledge thereof." (*People* v. *Jones*, 25 Cal. App.2d 517, 520 [77 P.2d 897]; see also *Anderson* v. *Superior Court*, 78 Cal.App.2d 22, 24 [177 P.2d 315].) Defendant contends that there was no proof of the conspiracy *aliunde*

these acts and declarations prior to defendant's entry, which would make them admissible under the rule in *People* v. *Mac-Phee,* 26 Cal.App. 218, 224 [146 P. 522], to the effect that the conspiracy must be proved otherwise before such prior acts and declarations become admissible. Here the conspiracy was so proved by the testimony of Kirkpatrick. ▮ Proof of the conspiracy may be made by the testimony of one of the conspirators. (*People* v. *Dixon,* 94 Cal. 255 [29 P. 504]; *People* v. *Steelik,* 187 Cal. 361, 377 [203 P. 78]; *People* v. *Collier,* 111 Cal.App. 215 [295 P. 898].) There is nothing in *People* v. *Miner,* 96 Cal.App.2d 43 [214 P.2d 557], or *People* v. *MacPhee, supra,* 26 Cal.App. 218, contrary to the principle enumerated in the above cases.

▮ (b) Testimony of a policewoman who, pretending to be pregnant, made arrangements with Ostrofsky at Sherman's drugstore for an abortion and secured Kirkpatrick to perform it, as to her conversations with Ostrofsky and Kirkpatrick. Kirkpatrick also testified to this incident. Nothing was said about defendant nor concerning the Wallace, Hosmer or Alexander abortions. This testimony was relevant to show that a conspiracy to commit abortions existed at Sherman's Pharmacy. The fact that such a conspiracy existed would not be confined to proof concerning abortions to which defendant was a party.

▮ (c) Kirkpatrick testified that after his arrest he met defendant at Lew's store, and told him about the arrest. Then, over objection, he testified that upon a second visit there, Lew gave him a typewritten, unsigned note stating that Mrs. Wallace was in a hospital and requesting Kirkpatrick to see Mr. Wallace, who "is very mad and wants his money back." Kirkpatrick did not know who wrote the note nor was it shown who did. Defendant contends that there was no foundation for its admission as it was not proved who wrote it. Having in mind that Mr. Wallace testified that the only person he told he wanted his money back was defendant, and defendant's statement to the district attorney that he endeavored to transmit Mr. Wallace's message to Kirkpatrick through Lew, the letter was admissible for the jury to determine whether the reasonable inference was that defendant had written it.

▮ (d) The charge that no foundation was laid is made concerning the letters, on defendant's letterheads, found in the Hosmer and Wallace mail boxes purporting to be signed by defendant, both to the effect that he had treated the par-

ticular patient for anemia. In his statement defendant admitted that he placed the Hosmer letter in her mail box. Obviously the letters were admissible. Defendant's admission as to the one, plus the circumstances, entitled the jury to reasonably infer that defendant had written the other. They were relevant as to whether they were the acts of an innocent person.

(e) The cashier's check issued in the name of "Don Burke," Kirkpatrick's pseudonym, and given to Mr. Wallace as a return of the money he paid Kirkpatrick for his wife's abortion. Although there was no proof as to who had purchased this check, in view of the circumstances of the case and Kirkpatrick's denial that he had purchased it, the check was admissible as raising a reasonable inference that defendant returned Mr. Wallace the money.

(f) The abortion instruments used by Kirkpatrick. While, in view of Kirkpatrick's testimony that he committed the abortions, they may have been cumulative evidence, nevertheless they were admissible.

4. *Mistrial.*

During the selection of the jury and in the presence of its prospective members, Ostrofsky, Sherman and Kirkpatrick pleaded guilty. This did not entitle defendant to a mistrial. The court immediately fully and fairly instructed the jury upon the subject. Moreover, the fact that they had pleaded guilty would have been brought out during the trial, anyhow. (*People* v. *Ross,* 98 Cal.App.2d 805, 808 [221 P.2d 280].)

5. *Instructions.*

(a) Among the instructions on conspiracy, the court gave one to the effect that if other evidence warranted a finding beyond a reasonable doubt that a conspiracy actually existed, the act and declaration of a coconspirator was admissible against another coconspirator. Defendant criticizes this instruction, claiming, first, that the only acts and declarations of the coconspirators the jury were entitled to consider were those occurring *after* defendant joined the conspiracy, and secondly, that the instruction did not require that the jury first find, before applying it, that defendant had joined the conspiracy. As to the second contention the instruction must be read in connection with all the others, from which it clearly appears that before the jury could apply any of the

conspiracy instructions it necessarily must find that defendant was one of the conspirators. ▮ As to the first point, the instruction was proper as it set forth the rule discussed in *Anderson* v. *Superior Court, supra,* 78 Cal.App.2d 22, and *People* v. *Jones, supra,* 25 Cal.App.2d 519, to the effect that one who enters a conspiracy already formed, with knowledge of its existence and purpose, is liable for the acts and conduct of the conspirators prior to his entry therein.

▮ (b) The court instructed that it was the theory of the prosecution that the substantive offenses charged in the indictment were committed pursuant to the conspiracy and therefore the instructions with reference to the law of conspiracy applied not only to the conspiracy charge but also to the substantive charges. Defendant relies upon *People* v. *Bateman,* 111 Cal.App. 109 [295 P. 530]. There the defendant was charged with one count of conspiracy and one count of a substantive offense. He was acquitted of the conspiracy charge. The court there limited the use the jury might make of evidence of declarations and acts of the alleged conspirators. On appeal, the defendant contended that perchance the jury disregarded this instruction and acted on the declarations of the alleged conspirators for purposes other than those stated in the instructions. The reviewing court held that there was nothing in the record to show that the jury did so, and in the absence of such showing the court was bound to assume that the jury followed the court's instructions. The Bateman case is not authority for the proposition that where, as here, the jury found defendant guilty of the conspiracy count, an instruction contrary to the one given in that case would be prejudicial. In *People* v. *Sampsell,* 104 Cal.App. 431 [286 P. 434], where the sole charge was the substantive one of robbery, it was held that "The law is definitely settled that upon the trial of an accused for the commission of a particular crime, the prosecution may show as a part of its case that such crime was committed in furtherance of a conspiracy to commit a series of like or other criminal acts . . ." (P. 438.) The court approved an instruction that the jury could consider the evidence as to the conspiracy for the purpose of "determining also whether the offense for which they [the defendants] were being tried was committed in pursuance of the common design of such conspiracy." (P. 440.) Similarly in *People* v. *Harper,* 25 Cal.2d 862, 866 [156 P.2d 249], where the sole crime charged was murder it was held that where there is proof of a conspiracy to commit a crime

and proof of an act reasonably and naturally related to the crime it was a question of fact for the jury to determine whether or not the act committed was the ordinary and probable effect of the common design. In view of defendant's statement to the district attorney (in the presence of his attorney and not denied) that he sent Alexander (the abortee in the substantive charge upon which he was convicted) to the Sherman Pharmacy to obtain an abortion, there could be no prejudice in this instruction. (See *Anderson* v. *Superior Court, supra,* 78 Cal.App.2d 22, where, as here, the defendant sent women to the abortioner for the purpose of having abortions performed.)

(c) The jury was instructed that one abortee may corroborate another. The instruction was of the type approved in *People* v. *Gallardo,* 41 Cal.2d 57 [257 P.2d 29]; *People* v. *Reimringer,* 116 Cal.App.2d 332, 337 [253 P.2d 756]; *People* v. *Kendall,* 111 Cal.App.2d 204, 210 [244 P.2d 418.]

(d) The court in defining the elements of the substantive offenses instructed that it was immaterial whether defendant received or expected to receive any benefit or gain, financial or otherwise, directly or indirectly, from the commission of the offense. The effect of this instruction is that it is no defense that defendant did not expect to receive or receive any material benefit from his participation in the abortions. This is the law.

(e) The court instructed that the woman upon whom the abortion is committed is not an accomplice of the person performing the abortion. Defendant concedes that this correctly states the law as set forth in *People* v. *Buffum,* 40 Cal.2d 709 [256 P.2d 317], but argues that we should construe section 1111, Penal Code, contrary to the construction given in that case. We are bound by that case.

In his closing brief defendant claims that the court prevented him from fully presenting a contrast between the present testimony of Miss Hosmer and that given before the grand jury. An examination of the transcript at the pages indicated does not support defendant's claim. The court asked defendant what particular question before the grand jury he claimed the witness had answered differently than at the trial. Considerable discussion followed between both counsel and the court. The latter pointed out that the witness had not been asked directly concerning the matter defendant was discussing, but was not requested to make any ruling,

and in nowise prevented defendant from proceeding with his examination of the witness. Defendant voluntarily dropped the subject, as the court was not asked to rule. *People v. Brophy,* 122 Cal.App.2d 638, 648 [265 P.2d 593], could not possibly apply. There was no error.

6. *Remarks of the District Attorney.*

In an interchange of remarks between counsel, the assistant district attorney stated that the fact that defense counsel could not be present at the grand jury investigation was "Probably fortunate for the administration of justice." The court then said, "Now that is settled, let's move along." No objection was made to the remark, nor was the court requested to instruct the jury concerning it. While the remark would better have been left unsaid, we can see no prejudice in it. Undoubtedly the jury considered it as the court apparently did, merely that airy persiflage among counsel which occasionally arises in the heat of a trial.

In his closing brief defendant contended that the court prejudicially erred in refusing a requested continuance made the afternoon of the first trial day. At that time defense counsel in the judge's chambers informed the court that about 11:30 that morning the Oakland police had arrested a man who it was claimed had attempted to extort money from defendant's father on the representation that he had influence with certain of the complaining witnesses in this case. The assistant district attorney stated that he had just learned of the matter. Defendant then requested a continuance for an opportunity to investigate. The assistant district attorney assured that a full investigation of the matter would be made. The defendant did not renew his request for a continuance nor ask for a ruling. Apparently the court assumed that the statement of the assistant district attorney "I can assure you no stone will be left unturned" closed the matter. On returning to the courtroom and the prospective jurors, another situation arose. The defendant became ill and fainted. After a short recess and an examination of the doctors who examined defendant that afternoon a discussion was had as to what day the case should be adjourned. The district attorney urged that it be only until the next day, defense counsel requesting that it be the following Monday (this was Wednesday), which request the court granted. At no time did defendant ask for a ruling on his previous request for a continuance to investigate the matter of the attempted extortion or refer to it again. From the discussion had with reference to the con-

tinuance necessary because of defendant's illness, it is clear that defendant was no longer requesting a continuance because of the other matter. There was no error here.

The judgment and order are affirmed.

Peters, P. J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 21, 1954. Carter, J., was of the opinion that the petition should be granted.