[Crim. No. 6208. In Bank. June 27, 1958.]

THE PEOPLE, Respondent, v. JAMES A. WEISS et al., Appellants.

541

Harold J. Ackerman for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Assistant Attorney General, Raymond Momboisse and John S. McInerny, Deputy Attorneys General, for Respondent.

SCHAUER, J.—Defendants James A. Weiss, Fred Lee Johnson, Addie Estelle Simmons, Gerald Lee Hubbard, and Vivian Hubbard were charged with (Count I) conspiracy to commit abortion committed continuously from March 29, 1955, through February 3, 1956, and (Counts II through VII) a series of six criminal abortions committed during that period. Defendants were tried before a jury, which found them guilty of all counts except as follows: Defendant Weiss was found not guilty as to Counts II and III; both the Hubbards and Simmons were found not guilty as to Count II. Each defendant moved for a new trial. The motions were denied, except as to defendant Simmons, who withdrew her motion for new trial and subsequently abandoned her appeal. Before us are the appeals of the remaining defendants from the ensuing judgments of conviction and from the order denying a new trial.

Defendants (collectively or individually, as appropriate in the context) argue that (1) the trial court erroneously admitted evidence obtained by illegal search and seizure; (2) the trial court erred in permitting the removal from the court room, before the taking of evidence began, of exemplars of

the handwriting of defendants Hubbard for the purpose of permitting examination of them by a prosecution expert; (3) the trial court erroneously admitted hearsay testimony of a telephone conversation between one of the abortees and an unidentified person who represented himself to be an attorney of defendants; (4) the trial court erroneously restricted the cross-examination of an accomplice witness; (5) the prosecuting attorney erred to defendant's prejudice in his argument to the jury; (6) defendants were denied their right to a speedy trial (U.S. Const., amendment VI; Cal. Const., art. I, § 13; Pen. Code, § 686, par. 1); (7) the trial court erroneously restricted defense counsel's examination of a defense witness offered to prove an alibi of one of defendants; (8) the trial court erroneously permitted the making, at the direction of the prosecuting attorney, and the introduction, on cross-examination of a defendant, of an exemplar of that defendant's handwriting; (9) the evidence is insufficient as a matter of law to sustain the conviction of defendant Gerald Lee Hubbard; (10) the trial court erroneously instructed the jury that one who becomes a conspirator after the formation of the conspiracy is liable for crimes committed by his coconspirators before he entered the conspiracy. For the reasons hereinafter stated, we have concluded that insofar as the matters complained of were error, the error was not prejudicial (Cal. Const., art. VI, § 4½).

■ *Evidence which Defendants Claim was Illegally Obtained.* Defendants Johnson, Simmons, and Weiss were arrested at the premises where the abortions were performed, 5460 The Toledo, Long Beach, at about 7:55 p. m. on February 3, 1956. Defendant Gerald Lee Hubbard was arrested at the Hubbard home, 6701 Sunnybrae Avenue, Canoga Park, at approximately 11:10 p. m. on the same night. On The Toledo premises were found an operating table and appurtenant equipment (displayed to the jury but not formally received in evidence); photographs of the premises were taken and received in evidence; a sterilizer, rubber gloves, forceps and other surgical equipment, surgical gowns and masks, and various papers were taken from The Toledo premises and received in evidence. Papers taken from the Sunnybrae premises were received in evidence. Defendants object to the introduction of this evidence on the ground that it was obtained by illegal search and seizure. The People introduced much evidence, outside the presence of the jury, which shows that the arresting officers had reasonable grounds to

enter and search the premises and arrest defendants without a warrant. Such evidence is as follows:

In the latter part of 1953 or the first part of 1954 Lieutenant Zander, police officer, investigated the activities of Vivian Hubbard, her brother, defendant Weiss, and her son, defendant Johnson. He observed Vivian taking women to 13605 Gault Street (not the premises involved in the present prosecution) and on two occasions observed defendant Gerald Lee Hubbard accompanying Vivian when she was taking women from those premises. From women who had been aborted on the premises Zander learned "that a woman who believed herself to be pregnant and desired to terminate her pregnancy would receive from any of several sources the telephone number Albany 2309 and the name Vivian, and instructions if she were to call that number and ask for Vivian that she could make arrangements to have an abortion performed; . . . that the woman who identified herself as Vivian would make arrangements satisfactory with the pregnant woman for her to go to a parking lot at Hody's Drive-in . . . at a designated time and that they would be instructed to have with them an amount of cash that would be set forth in this conversation; and that they would be instructed that they would be met there by a woman in a black Lincoln Capri and that they would be taken then to a doctor who would perform the abortion and would be subsequently returned to the parking lot"; that pursuant to these arrangements the women were taken to the Gault Street address, where they paid Vivian, disrobed, put on a white gown, and were assisted by Vivian onto an operating table and "instructed by her in the use of an anesthetic device that they described as a cannister with a face mask, . . . and that they would then notice a man dressed in a white mask with a cap . . . and wearing a white gown enter the room, and that on occasion they would see or hear the metallic clink of instruments, feel some instruments being inserted in their private parts, feel certain sensations of pain or pulling or cramping . . .; that after some minutes on this table they would awaken from a semi-consciousness . . . and following this procedure they would be returned by Vivian in this car to the parking lot where they had been initially picked up; and that in each instance following this procedure they would resume their normal menstrual periods."

Lieutenant Zander further learned that during the latter part of 1953 some aborted women were taken to the home of defendant Johnson and there cared for by Johnson and his

wife. In May, 1954, Lieutenant Zander had arrested defendants Vivian, Weiss, and Johnson, and Johnson's wife, and another person. Prosecution of these persons on the charges then laid resulted in disagreement of the jury; apparently prosecution on those charges of those who are defendants in this action was not carried further.

In January, 1955, Lieutenant Zander investigated an address in Seal Beach where the telephone was listed under a pseudonym of defendant Weiss. The officer had received information that women were being taken to that address for the purpose of having abortions performed, but he did not "actually see any of the operation at that address."

In July, 1955, Lieutenant Zander talked with Mr. Meade of the State Medical Board. Mr. Meade stated that he had received a report that Evelyn Rogers (sometimes referred to in the transcript as "Rodgers") had been hospitalized and that the doctor who treated her "reported it as a criminally induced abortion." Mrs. Rogers told Mr. Meade and a police officer that she "believed herself pregnant, wanted to terminate the pregnancy, had received from a source that she declined to name a Diamond telephone number and the name Vivian—no—that she had received a call from a woman that identified herself as Vivian, and that during the conversation she was given a Diamond telephone number to make subsequent calls to, and that she had had a conversation with this person in which she discussed the term of her pregnancy, her desire to terminate it, and the matter of what the price would be for the abortion, and that she was instructed to go to the Clock Café . . . on a certain day"; Mrs. Rogers went to the appointed place at the designated time and was taken to a house "where she had had certain instrumentation performed upon her after a payment of a sum of money"; the man who performed the operation wore a white cap, a mask, and a long white gown; "an anesthetic was used . . . a breathing device had been strapped to her wrist."

Lieutenant Zander learned from Officer Bates, to whom a Mr. Jaderquist had reported, that Mrs. Jaderquist was pregnant and planned to have an abortion; that after having talked to a Vivian on the telephone Mrs. Jaderquist arranged to go to the Long Beach Municipal Airport "where she would be met by a woman who would take her to the doctor." Thereafter, by listening to a telephone conversation between Jaderquist and Officer Bates, Lieutenant Zander learned that Mrs. Jaderquist had kept her appointment, was driven by a de-

scribed route from the airport to a house with the number "5460" on it, had been taken to an upstairs bedroom and given an anesthetic and "lost partial consciousness." Investigation by the police officers disclosed only one house in the described neighborhood with the number "5460" on it, that is, 5460 The Toledo.

Thereafter in front of 5460 The Toledo Lieutenant Zander saw a parked automobile with a license number which, investigation disclosed, was registered in the name of Harry M. Umann, who, the officers knew, was the attorney of Vivian, Weiss, and Johnson. Beginning January 16, 1956, Lieutenant Zander placed 5460 The Toledo under the observation of himself and other officers stationed in a disguised panel truck parked near the house. Officers observed Addie Simmons in the car registered to Umann take a number of young women to and from the premises. They observed Weiss at the premises in a pickup truck registered under his pseudonym, James Alexander. They observed Johnson leave in an automobile registered to Gerald Hubbard at 6701 Sunnybrae, Canoga Park.

At the Long Beach Municipal Airport officers observed Addie Simmons in the Umann car picking up and letting out women passengers.

On February 1, 1956, Lieutenant Zander telephoned Diamond 7-0583, a number which he ascertained was that of Gerald Hubbard by inquiry at the number Albany 2309 which he had learned in his prior investigations. The officer spoke to a person whose voice he recognized as that of Gerald Hubbard, said that he was "Frank La Peer" and made an appointment for an abortion for a fictitious "girl friend." It was arranged that the "girl friend," wearing described clothes, was to meet a woman named Addie in a Long Beach cafe. The following day the officer again called the Diamond number, spoke to a man whose voice he recognized as Hubbard's, told Hubbard that he was "Frank La Peer," and cancelled the appointment for the abortion.

On the basis of the foregoing information officers entered and searched the premises at 5460 The Toledo and 6701 Sunnybrae. The trial court ruled that the search of the premises was reasonable and that the evidence obtained by such search was admissible. The ruling is tenable in view of the evidence of the information obtained by the officers in the course of their lengthy investigations.

■ Some of the evidence offered on the issue of search and seizure was obtained prior to the decision in *People* v. *Cahan* (April 27, 1955), 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513]. Defendant argues that evidence illegally obtained prior to the Cahan decision cannot justify a search and seizure subsequent to that decision. Assuming, without deciding, that this argument would have merit if it applied to the facts at hand, it can have no application here. There is no showing that the investigations into the Gault Street address in the latter part of 1953 or early 1954 were illegally conducted, and no evidence illegally obtained in the course of these investigations was introduced at the present hearing on the justification of the search and seizure.

*The Evidence as to Count I.* Count I averred the conspiracy (proved by the evidence as a whole) and the following overt acts in furtherance of the conspiracy and to effect its objects:

1. That in June, 1955, defendant Johnson rented 159 Syracuse Walk, Naples. It was proved that Johnson rented the premises in June, 1955, and that in July, 1955, an abortion was performed on Edith Rogers at that address.

2. That about July 9, 1955, defendant Vivian Hubbard rented 5460 The Toledo, Long Beach. It was proved that this defendant rented those premises on the averred date and that abortions were subsequently performed there on the abortees named in Counts III through VII of the information.

3. That about July 14, 1955, defendant Gerald Lee Hubbard contracted for telephone service at 5460 The Toledo. It was proved that on that date an application for telephone service signed ''Gerald L. Hubbard'' was made to the telephone company, but the prosecution's handwriting expert testified that the signature was not in Hubbard's handwriting.

4. That on January 23, 1956, defendant Simmons transported Mary Yoho and Marion Powell from Long Beach Municipal Airport to 5460 The Toledo. This was proved by the testimony of Mrs. Yoho, the abortee named in Count VI, and Mrs. Powell, the abortee named in Count VII.

5. That about February 1, 1956, defendant Gerald Lee Hubbard had a conversation with H. Zander. Lieutenant Zander testified to the jury concerning the telephone conversation in which on that date he arranged an appointment for an abortion for a fictitious girl friend.

6. That on January 18, 1956, defendant Johnson received $350 from Nancy Cliff. Mrs. Cliff, the abortee named in

Count IV, testified that she paid Johnson this sum on the alleged date for an abortion.

7. That on January 19, 1956, Vivian Hubbard had a conversation with Marion Powell. Mrs. Powell testified that about that date she called Diamond 7-0583 and had a telephone conversation with a woman who identified herself as Vivian, with whom Mrs. Powell arranged for an abortion. This telephone number was listed to defendant Gerald Lee Hubbard, Vivian's husband.

8. That on January 18, 1956, defendant Weiss visited 5460 The Toledo to perform abortions. This was proved by the testimony of Nancy Cliff that on that date an abortion was performed on her at that address by a man dressed in a white robe, cap, and mask, whom she believed was the person depicted in a photograph of Weiss so garbed.

9. That on February 3, 1956, defendant Weiss visited 5460 The Toledo to perform abortions.

10. That on February 3, 1956, Weiss was dressed in a surgical mask, cap, and gown at The Toledo premises. Lieutenant Zander testified that on February 3 he saw Weiss enter the premises at 5460 The Toledo and that thereafter Zander entered the premises and observed Weiss in surgical garb with a mask. That Weiss' purpose was to commit abortions on February 3 can be inferred from the other evidence, hereinafter summarized, of his commission of abortions on other dates at that address.

*Evidence as to Count II.* Evelyn Rogers, who had received a promise of immunity from prosecution, testified as follows: In June, 1955, she was examined by a physician and informed that she was pregnant. After discussions with an unidentified person concerning termination of the pregnancy she received a telephone call from a woman who said that her name was Vivian. "She said that she heard I was in trouble and I said I believed I was. . . . She said that probably she could get someone to help me. I asked if it was a regular doctor and she said 'Yes.' I asked her how it could be done, and she said, 'A curettement.' I asked how much it was and she said $350. . . . She asked me what kind of a car I would have and I told her. . . . [S]he told me to go down to the Clock Drive-In on Pacific Coast Highway and be there at 1 :00 o'clock [on an appointed day] and I would be met by a fellow in a green car. . . . She gave me a telephone number in case anything went wrong. . . . It was a Diamond number. . . . On

Saturday I went down to the Clock Drive-In [with Patricia Carroll]. . . . We sat and waited for a while and pretty soon the green car did pull up alongside us and this boy [not identified as anyone in the court room] got out and I believe he did ask me if I was Evelyn. . . . I said, 'Yes,' and he said, 'Come with me.' Which I did." Miss Carroll waited for Mrs. Rogers at the drive-in. The young man drove Mrs. Rogers to 159 Syracuse Walk.

Mrs. Rogers was directed to a bedroom of the house where she met the defendant Johnson and a man in a mask and gown. She was told to undress and put on a white robe. She was placed on a table "lying down with my knees in the stirrups." Johnson explained to her how to use an anesthetic device; to "Put the clamp . . . on my wrist and bulb in my hand and the mask over my face, and if I felt myself waking I was to press the bulb and it would keep me relaxed and asleep. . . . The fellow in the mask and gown was down at the bottom of the table, and the other fellow [Johnson] was standing alongside of me." She felt an instrument inserted in her vaginal orifice, and "some sort of a pain tugging, pulling or pressure."

When the procedure was completed the masked and gowned man gave her an envelope containing pills on which was written the Diamond number and she was told that "if anything were to happen that I was to call that number." Mrs. Rogers then dressed and the young man who had brought her to the house drove her back to the drive-in, where she met her friend Patricia Carroll.

Within a few days Mrs. Rogers started hemorrhaging and became quite ill. She called the Diamond number and a woman who identified herself as Vivian told her to lie down and apply ice packs to her abdomen. Mrs. Rogers' illness continued. She called her own doctor and he immediately hospitalized her. She was interviewed by the police and by Mr. Meade of the State Medical Board. She related to them the incidents which she recounted in her testimony and directed them to the house where the abortion had been performed.

Thereafter Mrs. Rogers received a telephone call from an unknown person who assertedly identified himself as "Vivian's attorney." Her testimony in this regard will be hereinafter set forth in connection with defendants' meritorious contention that it should not have been received.

Patricia Carroll testified that Mrs. Rogers told her that she (Mrs. Rogers) was pregnant and was going to have an abor-

tion, and that the witness accompanied Mrs. Rogers to the Clock Drive-In, where Mrs. Rogers was picked up by a man in a green car.

*Evidence as to Counts III through VII.* The women who underwent the abortions involved in each of these counts testified substantially as follows: Each found that she was pregnant and determined to have an abortion. Each obtained the name Vivian and a Diamond telephone number (Diamond 7-0583, the number of the Hubbard residence) and was told that Vivian could make arrangements for termination of the pregnancy. Each called the Diamond number and talked with a woman who said she was Vivian (except Mrs. Yoho, who talked with a man at that number). Each was informed that the price would be $350, and made an appointment to meet a woman called Addie at the Long Beach Municipal Airport (except Mrs. Robinson, whose appointment was at a café). Each was met at the appointed time and place by defendant Addie Simmons and driven by her to 5460 The Toledo. There each saw the defendant Johnson and paid him $350. Upstairs each saw a man in a surgical robe, cap, and mask; Mrs. Cliff, Mrs. Robinson, Mrs. Yoho, and Mrs. Powell were able to identify a photograph of defendant Weiss in robe, cap and mask as the man who was present at The Toledo; and Mrs. Yoho was able to identify him in the courtroom.

Each of the women, as instructed by defendant Johnson, undressed and put on a surgical gown, and lay upon a table with stirrups. An anesthetic mask was placed on the face, with a device strapped to the wrist so that the patient could administer the anesthetic to herself. Johnson stood beside the woman and the man in the mask and robe stood at the foot of the table. The woman felt something inserted in her vaginal orifice, then, breathing the anesthetic, almost or altogether lost consciousness. After the operation was completed, each woman was given an envelope with the name Vivian and the Diamond telephone number and instructed to call if she had any trouble. Each of the women was instructed to put on a sanitary belt and pad and, after dressing, was returned by Addie to the place where she had been picked up.

*The Removal of the Handwriting Exemplars from the Court Room for Further Examination by the Expert.* After the jury had been empaneled and before the taking of testimony began the prosecuting attorney moved to withdraw from the clerk's possession exemplars of the Hubbards' handwriting which had been exhibits (numbered 14, writing of Vivian, and

15, writing of Gerald) at the preliminary hearing, in order that an expert might examine them. Defense counsel objected that ''The defendants have a right to be present at any examination and it should be conducted in open court.'' The court overruled the objection and granted the People's motion. Thereafter a handwriting expert testified upon direct examination that from a comparison of Exhibit 26 (Exhibit 15 at the preliminary hearing, an exemplar of the writing of Gerald) with other exhibits, notations of appointments for abortions, including particularly Exhibit 58, notation of the fictitious appointment made by Lieutenant Zander, he concluded that they were written by the same person. Still other notations of appointments for abortions were, in the opinion of the expert, written by the person who wrote Exhibit 27 (Exhibit 14 at the preliminary hearing, an exemplar of the handwriting of Vivian Hubbard).

On cross-examination of the expert, defense counsel asked whether he had testified at the preliminary hearing that '' 'It is my opinion that the writings found here in 13 [Exhibit 58 at the trial] . . . were written by the person responsible for the . . . [s]pecified writing in 14 [the exemplar of Vivian Hubbard's writing].) ' '' The witness replied, ''I don't recall how I answered the question. I know what I should have answered and I know what I should have said. Whether I made an error or a reporter made an error, I don't know.'' The expert further explained that before the preliminary hearing he had marked then Exhibit 13 (Exhibit 58 at the trial) ''H'' to indicate that in his opinion it was written by Gerald Lee Hubbard rather than ''V,'' the mark he used to indicate that writing in his opinion was that of Vivian. The expert further testified, ''Now counsel says I compared 13 against 14 and found them to be the same. That is not what I should have testified to. . . . [I]f I said 15 with 14 or 13 like it should have been, then the reporter is responsible for the mistake made in the record.''

▆ Defendants assert that they do not impugn the integrity of the handwriting expert, but that they wish to make the point that ''errors did show up after the handwriting expert was given a second look at the evidence,'' and that Exhibit 58 was of crucial importance to the prosecution's case because defendant Gerald Lee Hubbard denied Lieutenant Zander's testimony as to the telephone conversation concerning the fictitious abortion. There is no suggestion, however, that the expert's examination of the handwriting exemplars

immediately before the taking of testimony at the trial caused him to change his opinion as to the authorship of Exhibit 58. Rather, as he frankly testified, there was a mistake either in his testimony at the preliminary hearing or in the reporting of that testimony. It was for the jury to appraise the effect of this frankly admitted mistake.

Defendants rely on the unusual case of *People* v. *Ramirez* (1952), 113 Cal.App.2d 842, 849-851 [249 P.2d 307]. There defendant was on trial for illegal sale of heroin. In evidence were certain capsules which contained a residue of white powder. After the taking of evidence had been concluded, and in the absence and without the knowledge of defendant and defense counsel, the prosecution was permitted to turn the capsules over to a chemist for analysis. The prosecution was then permitted to reopen the case and introduce testimony of the chemist that the capsules had contained heroin. It was held that the court's action was prejudicial error because (p. 851 [2] of 113 Cal.App.2d) "All proceedings in connection therewith were secret. Defendant was not notified and thus given an opportunity to object to such action or to participate therein. Defendant was also denied the right to have another chemist present when the test was made."

█ The circumstances of the present case are materially different from the circumstances which were held to constitute prejudicial error in Ramirez. The proceedings here were not secret. Although it does not appear that the court acceded to defense counsel's statement that "if anything is to be done to the exhibits, we have a right to be there," there is no indication that defendants' attorney requested or that he would have been denied an opportunity to have his own expert examine the exhibits. And the removal of the exhibits for examination occurred before they were introduced in evidence and before the taking of testimony began, not, as in the cited case, to the surprise of an unnotified defendant, after it had been announced that the taking of testimony was concluded. In the circumstances we find no error in permitting the examination of the exemplars by the handwriting expert.

█ *Evidence of Telephone Conversation Between the Abortee Evelyn Rogers and a Person who Represented that he was Defendant Vivian's Attorney.* As previously stated, there is evidence that Mrs. Rogers directed Mr. Meade of the State Medical Board and police officers to the Syracuse Walk premises where the abortion was performed on her. Following such foundation her testimony continues:

"Q. By Mr. Cochran [prosecuting attorney]: The following day . . . did you receive a telephone call? A. Yes, I did.

"Q. Was it from a man or from a woman? A. I think it was from a man.

"Q. Did that person purport to know what you had done the day before? A. Yes. He said he had heard that I was in the hospital, that I had been ill.

"Q. And speaking about your activities the day before you got the telephone call about going to this place with those persons, do you remember that being the subject of the conversation on the telephone? A. Yes, I believe so.

"Q. Do you remember what was said? A. I believe I was asked if we had gone down. I said 'No.'

"Q. Did the person tell you who it was? A. I don't remember. That has been over a year ago.

"Q. Just relate it as nearly as you can, Mrs. Rodgers.

"Mr. Umann [defense counsel]: He would be calling for hearsay at this time, your Honor.

"The Court: I am inclined to agree. There has been no identification of the person to whom she talked. The objection is sustained.

"Q. By Mr. Cochran: Do you remember the person who talked to you, stating what his position was in respect to the defendants in this case?

"Mr. Umann: . . . I object to that and move to strike it on the grounds that there is no evidence that he had stated what his position was, and he is asking the identity of the person that said that. There is no evidence that it was said even. . . . [I]t is also a leading question. If she knows she can say; if she doesn't know, that is all he is entitled to find out.

"The Court: The objection is sustained on the ground that it is leading. If she remembers any of the conversation, I have no objection to her stating.

"Q. By Mr. Cochran: Tell us the best you remember as to who the person said he was, if he did say, Mrs. Rodgers.

"The Court: . . . Did he identify himself, if it was a man, over the phone to you?

"The Witness: I don't recall too well. I believe he may have said that he was Vivian's attorney . . . That is my best memory. . . .

"Q. By Mr. Cochran: Go ahead and state the conversation.

"Mr. Umann: We will object to this as calling for hearsay.

"The Court: The objection is overruled. . . .

"A. He said that he heard that I had been in the hospital and had I been contacted by anyone? I don't recall if I said yes or no. That I don't recall. They asked me if I knew a Mr. Meade. . . . I said not that I could recall. I don't think I said I did. I don't think I remembered his name at the time myself, and if I had gone down to Long Beach to point out the house, and I said no. That is about all I can remember of the conversation.

"Q. That, of course, was not true? A. No, it wasn't true."

On cross-examination, the following occurred:

"Q. Did this man give his name? A. No. Not that I can recall. . . .

"Q. Do you recognize the voice? A. You mean now?

"Q. Yes. A. No, I don't."

Thereafter defense counsel moved to strike Mrs. Rogers' testimony as to the telephone conversation on the ground that it was hearsay and "because of the innuendo that the jury may derive from this hearsay that is damaging the attorney in this case. It was never shown to be the attorney in this particular case, yet, this is the implication that was produced by this voice that she didn't identify as anybody . . ."

The trial judge refused to strike the hearsay testimony; this was error. However, the prosecuting attorney stated to the jury, "I don't want the jury to get the impression that it [the anonymous telephone call to Mrs. Rogers] was Mr. Umann, or anyone acting on his behalf, or even acting with his knowledge." And the trial judge stated, "The Court has the same impression that Mr. Umann had no part of that. We don't even know it was an attorney actually. Certainly it was not this defense counsel."

The testimony as to the telephone call was not admissible. The record is barren of any showing that the call was connected with or authorized by any defendant. The People assert that the evidence was admissible to show that the witness Rogers had been "impliedly intimidated" (see *People* v. *Cunha* (1951), 107 Cal.App.2d 382, 386 [2] [237 P.2d 12]) and that the context of the conversation makes it apparent that the call was from an agent of defendants since only such an agent would have been familiar with the matters to which the caller referred. But, obviously, certain prosecution agents were at least as aware of the suggested facts as were the defendants and, insofar as competent evidence is concerned, the trial court had no more basis for assuming that the call came from an agent of defendants than from an agent of the prose-

554

cution. ■ The rules here pertinent are stated as follows in *People* v. *Kendall* (1952), 111 Cal.App.2d 204, 213 [244 P.2d 418] : '' [18] Efforts to suppress testimony against himself indicate a consciousness of guilt on the part of a defendant, and evidence thereof is admissible against him. [Citation.] ■ [19] Generally, evidence of the attempt of third persons to suppress testimony is inadmissible against a defendant where the effort did not occur in his presence. [Citation.] However, if the defendant has authorized the attempt of the third person to suppress testimony, evidence of such conduct is admissible against the defendant.'' (See *People* v. *Gilliland* (1940), 39 Cal.App.2d 250, 255-257 [1] [103 P.2d 179] ; *People* v. *Burke* (1912), 18 Cal.App. 72, 91-92 [122 P. 435].) ■ If the attempt is made by a third person, not in the presence of a defendant or shown to have been authorized by him, it should at once be suspect as a mere purporting attempt to suppress evidence and in truth an endeavor to prejudice the defendant before the jury in a way which he cannot possibly rebut satisfactorily because he does not know the true identity of the pretender. The wilful offering of such evidence might well form the basis for declaring a mistrial instanter, or for granting a new trial, or for reversal on appeal if the case is not so strong and the record otherwise so clear as to bring the judgment within the saving grace of California Constitution, article VI, section 4½.

■ It is only by reliance on the above mentioned constitutional provision that this case can be saved. Viewing the record as a whole and in accord with the rules we have established (*People* v. *Watson* (1956), 46 Cal.2d 818, 836 [299 P.2d 243]), it does not appear that the improper admission of the hearsay evidence prejudiced defendant Johnson, the only defendant who was convicted of the abortion of Mrs. Rogers, or the other defendants so far as their convictions of conspiracy are concerned. In the light of the wealth of competent evidence against the defendants, it appears unreasonable to believe that the jury attached controlling significance to the small bit of evidence concerning the telephone call.

■ *Restriction of Cross-Examination of the Accomplice Witness Jaderquist.* Mrs. Jaderquist testified in detail concerning the abortion alleged in Count III. Mr. Jaderquist testified that he was her husband; that she told him she was pregnant and desired an abortion; that he drove her to the Long Beach Municipal Airport where they were met by defendant Simmons; that Mrs. Simmons drove away with Mrs.

Jaderquist after instructing Mr. Jaderquist to pick her up at an appointed time and place; that he did pick her up at such time and place.

Defendants complain of the sustaining of objections, on their cross-examination of Mr. Jaderquist, to questions whether he approved of or objected to the abortion; they also complain that they were not allowed to go into the fact that prior to and immediately after his wife's abortion he had been in touch with the police in connection with it. These matters, defendants urge, would have shown bias and prejudice on the part of the witness toward the defendants.

Thereafter the defense called Mr. Jaderquist as a witness. Defense counsel brought out the fact that the witness had been in touch with the police about two weeks before his wife made final arrangements for the abortion, later reported to the police the facts concerning his meeting with defendant Simmons and matters which his wife had told him concerning the abortion, and "was very unhappy with the idea of my wife having this particular abortion at that particular time."

Although it might have tended to show bias against the defendants on the part of Mr. Jaderquist had defense counsel been allowed to show by cross-examination that he did not want his wife to have an abortion and that he cooperated with the officers at the time of the abortion in their efforts to build a case against defendants, it does not appear that defendants were prejudiced by the restriction of cross-examination in these respects since all the matters which they desired to bring out were elicited from Mr. Jaderquist when he testified for the defense. While there may have been some loss of effectiveness in the presentation of the defendants' case due to the fact that they were not allowed to bring out these facts immediately after the witness testified for the prosecution, the matter, at least in and of itself, does not appear to be a serious one.

*Argument of the Prosecuting Attorney.* There was no objection at the time of argument to the following matters which defendants now assert constituted prejudicial misconduct:

The prosecuting attorney referred to defendants' operations as an "abortion mill."

"I say . . . everyone of them is lucky she is alive and survived this ordeal."

"Here is a woman who might be going right into peritonitis or a situation that would cause her death, but they already

had her money. This is sort of a heartless approach, 'Put on some ice packs. You will be all right.' "

"[D]oes it occur to you what a chance these women were taking going to a place where this man had no medical training, conveniences for reviving a woman who might go into shock. . . . Can you not imagine with some possible horror what could happen to a woman if some emergency of that sort arose. Of course, that is not an element of the offense, but it is just a thought . . . that I wanted to leave with you. . . ."

The People rely upon the general rule that where there is misconduct it is ordinarily the duty of counsel to promptly call the attention of the court to the matter and request that the jury be instructed as a foundation for complaint on appeal. (*People* v. *Kirkes* (1952), 39 Cal.2d 719, 726 [249 P.2d 1].) The defendants rely upon the well recognized exception to this rule where the comment is such that the error could not be cured and the harmful result obviated by timely instruction to the jury. (*Ibid.*)

It does not appear that the above instances of asserted misconduct were flagrant or incurable. The description of defendants' operation as a "mill" appears warranted by the evidence that many women were aborted, and the references to the dangers of the operation appear not unwarranted in view of the circumstances that they were carried on in private houses and, it could be inferred, not under normal hospital conditions, and that they were performed by persons who, so far as the evidence disclosed, were without medical or surgical training.

 Two other women, Mrs. Gerry and Mrs. Sun, testified for the prosecution in substance similarly to, but in less detail than, the women named in the abortion counts. In his argument to the jury, defense counsel said, "We have covered the six women involved in this case. In addition to that, you heard the story of two women . . ., Mrs. Gerry and Mrs. Sun, who have told you substantially each and every detail that these women have told you. . . . Why are they not a basis for a criminal count in this case? There is an answer to it, because there has been a complete adjudication. There has been a hearing in this case to determine whether or not there was sufficient evidence."

The prosecuting attorney objected, "I am going to ask that counsel be immediately stopped on that line of argument. There is nothing in this record. An attempt was made before to inject it and it was stopped."

The court ruled, "There is nothing before the Court along the line that counsel is talking about. You are instructed to disregard it. You are not to proceed with that line of argument."

In his closing argument the prosecuting attorney said, "He [defense counsel] says, 'Why didn't they make a count out of that? Why didn't they make counts of other women?' What advantage or what reason would it be, we have six substantive counts of abortion; we have one count of conspiracy; what additional strength would it have lent to the case for us to have brought in five, ten, fifteen or twenty other women?"

Defense counsel said, "I think it is totally unfair to permit this to go unchallenged. Knowing these women did serve as a basis of a charge and there has been an adjudication at the preliminary hearing, and there was not sufficient evidence. Now he is telling the jury we have enough anyway. When he knows there has been a hearing on it."

The prosecuting attorney said, "Counsel already has been admonished by the Court and he is violating the Court's instructions."

The court ruled, "You had both better stay away from that subject. There is no such evidence before the Court at all. The citation of misconduct each way is denied."

Defendants now cite the above quoted argument of the prosecuting attorney as prejudicial misconduct. As appears from the argument of defense counsel, it was he who first injected into this case the matter of asserted adjudication adversely to the prosecution of charges laid by the witnesses Gerry and Sun. While it would certainly have been better practice on the part of the prosecuting attorney—since his objection had barred the subject—not to have mentioned the matter further, and while the trial court could well have held that the re-introduction of the subject by the prosecutor had opened the door, it may fairly be said that inasmuch as the point of the argument was originated by defense counsel and since defense counsel in his objection to the prosecuting attorney's argument again placed the inadmissible matter before the jury, there is no present ground for holding that the defendants were prejudiced by the ruling, "The citation of misconduct each way is denied." In this sparring, defense counsel appears to have been fully the match of the prosecutor, and the trial judge to have been impartial in seeking to have a verdict reached on evidence rather than innuendo.

*The Right to a Speedy Trial.* The information was filed on March 29, 1956. On May 15, 1956, with the consent of defendants trial was set for July 30. On Monday, July 30, 1956, the cause was called and defense counsel answered, "ready for trial." Mr. Cochran, the prosecuting attorney, stated that he was trying a case in another department; that "This is a very long and complicated case and there is no one else prepared on it but myself. It will have to trail. I understand we might get on by Wednesday." The trial judge said, "We were supposed to have a judge here on Wednesday. Now we are not sure whether he will be here Monday or Wednesday. If he does not come we can only trail it again to Monday." He ordered the cause continued until Wednesday, August 1. Defense counsel said, "We are ready for trial today. . . . We are not waiving our statutory time." (As appears from the foregoing statement of facts, defendants had already initially waived their "statutory time" in that they had consented to be tried more than 60 days after the filing of the information. Pen. Code, § 1382, par. 2.)

On Wednesday, August 1, defense counsel stated, "defendants will waive time and request that the matter go over to Tuesday," and each defendant personally answered affirmatively the question whether he "waive[d] time for trial and consent[ed] that your trial be held August 7."

On August 7 when the case was called for trial defense counsel moved for a dismissal on the ground that "I objected on Monday, July 30th, at that time counsel for the People stated that there was no court open and he was engaged in trial. . . . [W]e move to dismiss, because there were in fact fourteen departments of the Superior Court open in Los Angeles County." The court denied the motion. Trial proceeded.

It should be noted that pursuant to rules of court trial was held in the Long Beach branch of the Los Angeles superior court, and there is no showing that a judge was available for trial in that branch on July 30, when defendants contend they should have been allowed to go to trial. As in *People* v. *Osslo* (1958) *ante,* p. 75 [323 P.2d 397] (see *ante,* p. 106 for more complete discussion of the law), it appears that in the circumstances here the orderly administration of justice was served by the granting of a continuance and that defendants were not thereby prejudiced.

▄▄▄ The right to a speedy trial is one which defendants can waive. (*People* v. *Hocking* (1956), 140 Cal.App.2d 778,

780 [2] [296 P.2d 50] ; *People* v. *Workman* (1953), 121 Cal. App.2d 533, 536 [5] [263 P.2d 458].) ▇▇ Although consent to delay beyond the 60 day period from the filing of the information does not amount to a waiver of the right to a speedy trial, it has been held that where a defendant did so consent he "was not entitled to go to trial as of right on the day to which he last consented if good cause appeared for further delay. But the further delay must not be unreasonable and good cause is shown where the condition of the court's business would not permit the trial to proceed. [Citations.]" (*In re Lopez* (1952), 39 Cal.2d 118, 120 [3] [245 P.2d 1].) The record here meets the test.

▇▇ *Restriction of Defense Counsel's Examination of a Defense Witness Offered to Prove an Alibi of Defendant Gerald Hubbard for the Time of Lieutenant Zander's Cancellation of the Fictitious "La Peer" Appointment.* Gerald Hubbard was the only defendant who took the stand. As previously stated, Lieutenant Zander testified that in a disguised voice he talked with Gerald Hubbard and made (on February 1) then cancelled (on February 2) a fictitious appointment for an abortion. Hubbard testified that he did not talk with Zander on these occasions and that he was at work at the fire department for 24 hours commencing at 8 a.m. on February 2.

The defense called as a witness Acting Captain Coultrup of the fire department. He testified that he kept the journal records of the department and brought the journal to court. He further testified that he had no independent recollection of what men were on duty on February 2. Asked whether the journal refreshed his recollection as to who was present at the department on that date, he answered, "No."

To the question, "Were there any changes of personnel that day?" the prosecuting attorney objected "in view of the witness' answer that his recollection is not refreshed, and that it must be reflected by the book, and we state that it is not the best evidence." The objection was sustained. A similar objection was sustained to the question, "Did you mark any absentees for that day?"

The journal, introduced in evidence, contained an entry that Hubbard was detailed to the rescue unit.

On redirect examination Coultrup was asked, "would it refresh your recollection as to your activities on other days . . . if you looked at the entries?" An objection that this was "irrelevant to anything in this inquiry" was sustained. To

the question, "As to events and not individuals, would it refresh your recollection to look at the book and see what the entries were?" an objection that the question "calls for speculation . . . and is not proper redirect examination" was sustained.

Defendant Gerald Hubbard argues that his examination of the witness Coultrup was improperly restricted. It is apparent from the record that the witness had no independent recollection of the personnel on duty on February 2 or on other days. In the circumstances the only evidence of Hubbard's presence at the fire department which could be produced by the witness was the journal which was put in evidence. Defendant Gerald Hubbard further argues that the above quoted questions on redirect examination should have been allowed "to sustain . . . [Coultrup's] veracity and integrity." However, defense counsel does not explain how any answers of the witness Coultrup to those questions could have such effect; indeed, it does not appear that the "veracity and integrity" of such witness had been impugned. In the circumstances the restriction of the testimony of the witness was not improper.

■ *Asserted Error in Permitting the Making and Introduction in Evidence of an Exemplar of the Handwriting of Defendant Gerald Hubbard on Cross-Examination.* Defendant Gerald Hubbard testified as follows: He did not receive a telephone call from Lieutenant Zander or "Frank La Peer" on February 1. He was visiting his wife at the hospital throughout that day. He did not receive such a call on February 2. He was working at the fire department throughout that day. He denied testimony that after his arrest he told Zander that he (Hubbard) recognized Zander's voice over the telephone.

On cross-examination Mr. Hubbard, at the request of the prosecuting attorney, without objection, wrote various words which appeared on the notations of two appointments for abortions which the handwriting expert had testified were in Mr. Hubbard's handwriting; one of these was the fictitious appointment with the "girl friend" of "Frank La Peer." The prosecuting attorney then offered the witness' handwriting in evidence. Defense counsel objected that on his direct examination "I did not say a word about writing." The prosecuting attorney said, "Here is my reasoning, your Honor. If he were not there on the 1st of February, then that note would not have been made by him. Now, in respect to whether

or not it was in fact written by him, I had a right to question him about other writing and to ask him to write and then let the jury determine whether or not. They also have the function of determining handwriting.'' The court agreed and overruled the objection.

Section 1323 of the Penal Code provides that if a defendant ''offers himself as a witness, he may be cross-examined by the counsel for the people as to all matters about which he was examined in chief.'' Defendant Gerald Hubbard argues that the introduction in evidence of the handwriting exemplar made on cross-examination went beyond the permissible limits of cross-examination as stated in this section and explained in *People* v. *Zerrillo* (1950), 36 Cal.2d 222, 227-228 [223 P.2d 223]: ''[6] If a defendant takes the stand and makes a general denial of the crime with which he is charged the permissible scope, of cross-examination is very wide. [Citations.] [7] Moreover, as stated in *People* v. *Teshara*, 141 Cal. 633, 638 [75 P. 338], 'A defendant cannot, by testifying to a state of things contrary to and inconsistent with the evidence of the prosecution, thus indirectly denying the testimony against him, but without testifying expressly with relation to the same facts, limit the cross-examination to the precise facts concerning which he testifies. He can be cross-examined with respect to facts or denials which are necessarily implied from the testimony in chief, as well as with respect to facts which he expressly states.' '' (See also *People* v. *Tarantino* (1955), 45 Cal.2d 590, 599 [12] [290 P.2d 505].)

As defendant Gerald Hubbard points out, he made no categorical denial of the crimes. But the above quoted reasoning of the prosecuting attorney as to the receipt in evidence of the exemplar made on cross-examination is sound. By testifying to a state of facts inconsistent with his having written the ''La Peer'' notation, Mr. Hubbard became subject to cross-examination (including the making of the exemplar) concerning his writing of that notation.

 *Sufficiency of the Evidence to Support the Conviction of Gerald Hubbard.* The following summary of the evidence against Gerald Hubbard suffices to refute his contention that the evidence against him was insufficient to sustain his conviction:

According to the testimony of Mrs. Rogers, the abortee named in Count II, a few days before July 2, 1955, the date of her abortion, a woman who said her name was ''Vivian'' (the name of Mr. Hubbard's wife, a convicted defendant

herein), over the telephone, gave Mrs. Rogers a Diamond telephone number to call in connection with Mrs. Rogers' arrangements for the abortion. The home telephone number of Gerald Hubbard was Diamond 7-0583. This was the number at which other abortees were told to call "Vivian" and the number which Lieutenant Zander called when he arranged with Gerald Hubbard the fictitious appointment for an abortion and when Zander subsequently cancelled that appointment.

As already stated, on July 14, 1955, an application for telephone service at 5460 The Toledo was made in the name of Gerald Hubbard. Credit information given in connection with this application included the notations, "Employed by Los Angeles Fire Department 9th and Santee. Fireman. Personal address 6701 Sunnybrae, Canoga Park." This information as to Mr. Hubbard was accurate. But, as previously stated, the application for telephone service, in the opinion of the People's handwriting expert, was not written or signed by Mr. Hubbard. Mr. Hubbard testified that he did not register for the telephone at The Toledo or instruct anyone to register for it on his behalf. However, the question whether he was connected with the registration, in the light of the other evidence, was for the appraisal of the trier of fact.

In the Hubbards' home were found notations of apparent appointments for abortions in Mr. Hubbard's handwriting. In addition to notations concerning women not otherwise identified in the testimony, there was a notation reflecting the fictitious "La Peer" appointment which Zander testified he made with Mr. Hubbard. Other notations in Mr. Hubbard's handwriting included one for an appointment for Mrs. Mary Yoho, who testified that she was aborted on January 23, 1956, and one for an appointment for Mrs. Dorothy Gerry, who testified that she was aborted on February 3, 1956.

On an unspecified date, at The Toledo premises, Lieutenant Zander observed a Mercury automobile registered to Gerald Hubbard; it was driven by defendant Johnson. On January 20, 1956, at The Toledo premises, Zander observed the Mercury; it was driven by defendant Simmons and with her was a girl whom Zander "had seen her [Simmons] pick up at the Long Beach Municipal Airport." Mr. Hubbard testified that he had given this automobile to defendant Johnson as a Christmas present. The effect of this testimony as connecting Mr. Hubbard with the activities at The Toledo premises was for the appraisal of the trier of fact.

Officer Galindo went to the Hubbard residence on February 3, 1956, and was invited in by Mr. Hubbard. The officer said, "You are under arrest on suspicion of abortion." Mr. Hubbard said, "Well, what is this all about?" Officer Galindo replied, "Well, we knocked over the place down at 5460 The Toledo and you are in on it." Mr. Hubbard asked, *"How deep am I in on it?"* (Italics added.) Galindo replied, "Well, if you want to sit down and talk about it . . . I will discuss it with you." However, Mr. Hubbard refused to discuss the matter further. He did thereafter say, "I knew that was Sergeant Zander on the phone I talked to the other day," but said further that he (Hubbard) did not talk with Zander; "He [Zander] just said hello."

On the night of February 3 at the Los Angeles police station Zander saw Mr. Hubbard. Zander said, "Hello, Jerry," and Hubbard replied, "Hi, I thought I recognized your voice the other day. It is nice to talk to you again."

 In the light of the other evidence connecting Gerald Hubbard with the remaining defendants and with abortions, it can fairly be said that the evidence concerning the telephones is competent and shows his association with the charged criminal activities as early as July, 1955. He could be found to have been a member of the conspiracy to commit abortions from that time on until his arrest in 1956 and, therefore, liable as a co-conspirator for the series of abortions of which he was convicted, commencing with the abortion of Mrs. Jaderquist on November 23, 1955 (Count III) and extending through the abortion of Marion Powell on January 23, 1956 (Count VII), under the rule that "after a conspiracy to commit an unlawful act is established, every act of each member of the conspiracy [pursuant to or growing out of the conspiracy] is in contemplation of law the act of all of them." (*People* v. *Harper* (1945), 25 Cal.2d 862, 870 [2] [156 P.2d 249]; *People* v. *Waller* (1939), 14 Cal.2d 693, 703 [8] [96 P.2d 344]; *People* v. *Kauffman* (1907), 152 Cal. 331, 334 [92 P. 861].)

 *The Erroneous Instruction as to Conspiracy.* At the request of the People the jury were instructed as follows:

"Where a criminal conspiracy has been formed, each of the persons forming the same, while he is a member thereof, is liable for every act, and is bound by the acts and declarations of each and all the conspirators, done or made in pursuance and furtherance of the said conspiracy, and *every person who joins and becomes a party to a conspiracy after*

*the formation thereof, and who adopts the said conspiracy and its purposes and objects, becomes liable for every act,* and is bound by each and all the declarations *of each and all the other conspirators done in pursuance and furtherance of the said conspiracy,* and continues to be so liable and bound for so long as he remains a member thereof." (Italics added.) This instruction is CALJIC Instruction 932. (Calif. Jury Instructions, Criminal, 1946 ed.) Defendants, not without reason, urge that the italicized portion of the instruction erroneously informed the jury that a conspirator could be held liable for crimes committed by his coconspirators before he joined the conspiracy.

That this error may have made an impression on the jury, defendants argue, is shown by the fact that after the jury had retired they returned into court and their foreman said, "We would appreciate if you could read the instructions concerning conspiracy to us again. There seems to be quite a bit of confusion on it." The court reread the instructions on the subject, including the instruction to which defendants object.

Defendants rely on the following statement in 11 California Jurisprudence 2d, Conspiracy, section 9, page 229: "It would appear . . . that where the act is itself criminal there is, upon the part of one joining the conspiracy subsequent to the act, no liability as a principal, as that term is defined in the Penal Code, and a defendant in a criminal action is convicted as a principal or accessory or not at all. No case has been found in which a conspirator has been prosecuted for a crime committed by a coconspirator during the course of the conspiracy and pursuant to its ends, where the crime was incidental to the conspiracy and not the substantive offense contemplated by it, and where it was committed prior to defendant's entry into the conspiracy." ■■■ Section 31 of the Penal Code defines a principal as one "concerned" in the commission of a crime. Manifestly, a conspirator is not "concerned" in the commission of a crime which was committed before he joined the conspiracy.

■■■ As we read CALJIC Instruction 932 (Calif. Jury Instructions, Criminal, 1946 ed.), it is susceptible, as defendants urge, of the interpretation that one who "becomes a party to a conspiracy after the formation thereof, and who adopts the said conspiracy and its purposes and objects, becomes *liable* for every act . . . of each and all the other conspirators done in pursuance and furtherance of the con-

spiracy'' (italics added), including criminal acts done before the person joining the conspiracy became a party thereto. This is not the law and we are not disposed to adopt such a rule as the substantive law of the state. ▮ At oral argument the People commendably disavowed any purpose of contending for such a rule of substantive law and urged only the rule that where a person joins a conspiracy after its formation and actively participates in it, he adopts the prior acts and declarations of his fellow conspirators pursuant to the conspiracy *to the extent that evidence of those acts and declarations is admissible against him. (People* v. *Sherman* (1954), 127 Cal.App.2d 230, 237 [4] [273 P.2d 611]; *People* v. *Griffin* (1950), 98 Cal.App.2d 1, 44 [20] [219 P.2d 519]; *People* v. *Jones* (1938), 25 Cal.App.2d 517, 520 [77 P.2d 897]; *People* v. *Fitzgerald* (1936), 14 Cal.App.2d 180, 203 [58 P.2d 718], cert. den. 299 U.S. 593 [57 S.Ct. 115, 81 L.Ed. 437]; *People* v. *MacPhee* (1914), 26 Cal.App. 218, 224 [146 P. 522]; *People* v. *Schmidt* (1917), 33 Cal.App. 426, 443, 446 [165 P. 555].) And, as is hereinafter developed in more detail, it is admissible against him only to show such matters as the nature and objectives of the conspiracy in which he joins, and the incidents thereof, but not to prove his guilt of substantive crimes theretofore committed.

We recognize that it is said in 1 Wharton's Criminal Law and Procedure (1957), section 90, page 198, and 11 American Jurisprudence, Conspiracy, section 8, page 549, that "The rule of responsibility for the acts of co-conspirators includes acts done before the defendant joined the conspiracy, as well as the acts subsequent to his participation," and in 15 Corpus Juris Secundum, Conspiracy, section 75, page 1108, that persons who come into a conspiracy after its formation and assist in the furtherance of its execution with knowledge of its purpose "are deemed in law parties to all acts done by any of the other parties, either before or after, in furtherance of the common design."[1] But the cases cited in those works for the

[1]In the latter work it is added that "some authorities have held that a person joining in a conspiracy after its formation is not responsible for acts done by other members of a combination before he became a member," citing *State* v. *Duncan* (1876), 64 Mo. 262, 266, where it is said, "The second instruction given for the State is erroneous in telling the jury that if there was a party of persons combined for the purpose of stealing horses, etc., and sharing in the proceeds, and defendant at any time, at or after the formation of said company became a member, he was criminally liable for all the acts done by any other person belonging to the combination, before and afterwards, in furtherance of the common design. In other words, if the defendant joined a company of

quoted propositions are not cases where a defendant was convicted of a substantive offense committed by his coconspirators before he became a member of the conspiracy.

 Nor do the California cases which contain language in seeming accord with those propositions uphold conviction of a substantive offense committed by conspirators before the defendant joined the conspiracy. Implications in the language of the following cases that a defendant could be held retroactively liable for such a substantive offense are disapproved: *People* v. *Brumbach* (1957), 152 Cal.App.2d 386, 391-392 [314 P.2d 98]; *People* v. *Sherman* (1954), *supra*, 127 Cal. App.2d 230, 240 [13]; *People* v. *Griffin* (1950), *supra*, 98 Cal.App.2d 1, 44 [20]; *Anderson* v. *Superior Court* (1947), 78 Cal.App.2d 22, 24 [177 P.2d 315]; *People* v. *Fitzgerald* (1936), *supra*, 14 Cal.App.2d 180, 203; *People* v. *MacPhee* (1914), *supra*, 26 Cal.App. 218, 224.

It is often said, as stated in the People's brief, that "one who joins a conspiracy after its formation and actively participates in it, thereby adopts the previous acts and declarations of his fellow conspirators." But, as hereinabove indicated, this is not to say that such a one becomes substantively liable for previous criminal acts of his fellow conspirators to which he was not a party. Rather, he "adopts" the acts in the sense that evidence thereof is "original evidence against [him]" (*People* v. *MacPhee* (1914), *supra*, 26 Cal.App. 218, 224) in a prosecution for the conspiracy or for a crime committed as an object of or in furtherance of or as a natural outgrowth of the conspiracy *after he joined it.* To the same general effect see also *People* v. *Anderson* (1949), 90 Cal.App. 2d 326, 335 [202 P.2d 1044], holding competent to establish "jurisdiction and venue," evidence of the terms and objectives of a conspiracy originally formed *before,* and of an act pursuant to the conspiracy done *after,* defendant had joined it.

 Although the instruction under consideration (*ante,* pp. 563-564) is erroneous in suggesting that a defendant could be "liable" for a crime committed pursuant to the conspiracy prior to the time he joined it, and, hence, should never be given, the instruction was not prejudicial here because no defendant was convicted of a substantive offense of

---

horse thieves, he was liable for all the thefts they or any of them may have committed before he became a member, whether he received any part of the property so stolen, or its proceeds or not; his joining the company had relation back, and implicated him in every theft they had committed, even years before. The statement of the proposition is its own refutation."

abortion committed prior to the time that evidence connected him with the conspiracy.

Defendant Weiss was convicted of the abortion charged in Count IV and subsequent abortions. He was connected with the abortion charged in Count IV, committed on January 18, 1956, and with the conspiracy to commit abortions on and after that date, by the testimony of the abortee named in Count IV. This woman was shown a photograph of Weiss in a surgical gown and mask and asked, "do you recognize the person that is in this photograph as the person you talked to in that bedroom [where she testified that the abortion was committed]?" She answered, "I believe so." This is not insufficient as evidence of identity. (*People* v. *Harris* (1948), 87 Cal.App.2d 818, 824 [4] [198 P.2d 60]; *People* v. *Tullous* (1953), 119 Cal.App.2d 637, 640 [259 P.2d 955].)

We recognize that a defendant cannot be convicted of abortion upon the testimony of the abortee unless she is corroborated by other evidence (Pen. Code, § 1108) and that section 1108 applies also to the offense of conspiracy to commit abortion (*People* v. *MacEwing* (1955), 45 Cal.2d 218, 223 [1] [288 P.2d 257]; *People* v. *Buffum* (1953), 40 Cal.2d 709, 723-724 [19, 20] [256 P.2d 317]). As the following résumé of testimony will show, there is sufficient corroboration of the testimony of Mrs. Cliff, the abortee named in Count IV, which tends to show that Weiss was guilty of the substantive offense there charged and thus connected with the conspiracy as of that date:

Mrs. Cliff testified as follows: On January 18, 1956, at about 6:30 p. m. she and her husband arrived at the Long Beach Municipal Airport. Defendant Simmons picked her up in a black Cadillac, told Mr. Cliff to return at 9 o'clock, and drove Mrs. Cliff and another woman to 5460 The Toledo. Mrs. Cliff described the abortion procedure at The Toledo premises and testified that at its conclusion she was given pills in an envelope with the notation "Vivian, DI. 7-0583" and was told to call that number "if I needed any advice." Defendant Simmons then drove Mrs. Cliff to the airport, where Mrs. Cliff was met by her husband.

Corroborating the testimony of Mrs. Cliff that the date of the abortion charged in Count IV was January 18 is the testimony of Officer Mitchell that at 6:30 p. m. on that date he saw defendant Simmons, driving a black Cadillac, pick up Mrs. Cliff and another woman at the Long Beach Municipal

Airport, and that at about 9 p. m. he saw defendant Simmons return to the airport with Mrs. Cliff and saw Mrs. Cliff alight from the Cadillac and join her husband. As has already been shown, defendant Simmons is connected with the conspiracy, and The Toledo premises are shown to be the place where abortions pursuant to the conspiracy were committed, by other evidence. Tending to connect defendant Weiss with the crimes is the testimony of the police that they found him on The Toledo premises, dressed in surgical cap and gown and mask, when they arrested him.

 A majority of this court accepts the view that in a prosecution for abortion or for conspiracy to commit abortion the testimony of the woman aborted can be corroborated by the testimony of another woman that the same person performed an abortion upon her in a similar manner. (*People* v. *Davis* (1954), 43 Cal.2d 661, 675 [22, 23] [276 P.2d 801] ; *People* v. *Gallardo* (1953), 41 Cal.2d 57, 63-64 [10-11] [257 P.2d 29].) The testimony of Mrs. Cliff as to the abortion is therefore corroborated by the testimony of other abortees summarized *ante,* p. 549.

Defendant Fred Johnson was convicted of all the counts of abortion, commencing with the abortion charged in Count II, committed on July 2, 1955. The evidence connects him with the conspiracy as early as about June 6, 1955, when he rented the premises at 159 Syracuse Walk where the abortion charged in Count II was subsequently committed. The abortee named in Count II was asked, "Do you see either of those persons [who were present at the abortion] in the court-room?" She answered, "I see one, I believe," and pointed out defendant Johnson.

Mrs. Rogers, the abortee named in Count II, testified that she was aborted on the Saturday after a Wednesday in "the first part of July or the last part of June of 1955." Her testimony as to the date is corroborated by the testimony of her friend Mrs. Carroll that she accompanied Mrs. Rogers to the Clock Drive-In on July 2, 1955, after Mrs. Rogers had expressed her intention to undergo an abortion. At the drive-in, both Mrs. Rogers and Mrs. Carroll testified, Mrs. Rogers was picked up by a man in a green car. (See summary of their testimony, *ante,* pp. 547-549.) Mrs. Rogers' testimony as to the abortion and defendant Johnson's role therein is corroborated by the testimony of the other abortees that abortions were performed upon them in a similar manner and

that Johnson took a similar part in the proceeding (*ante*, p. 549).

Defendant Gerald Hubbard was convicted of all the abortions charged commencing with the abortion alleged in Count III, which was committed on November 23, 1955. (The abortion of which Mr. Hubbard was acquitted was that charged in Count II, committed July 2, 1955.) His connection with the conspiracy from July, 1955, as shown by the Diamond telephone number at his home and the application in his name for telephone service at 5460 The Toledo, is explained *ante*, pp. 561-562.

Defendant Vivian Hubbard was also convicted of abortions commencing with the abortion charged in Count III, committed on November 23, 1955. She was connected with the conspiracy as early as July 9, 1955, by testimony (together with the other evidence) that on that date she rented the premises at 5460 The Toledo.

Therefore, as hereinabove stated, the evidence connects each defendant with the conspiracy at or prior to the time of the commission of the earliest substantive offense of which he was convicted.

For the reasons above stated the judgments appealed from and the order denying a new trial are affirmed as to each defendant.

Gibson, C. J., Carter, J., Traynor, J., Spence, J., and McComb, J., concurred.

Shenk, J., concurred in the result.