Filed 4/14/14  P. v. Mondaine CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H038525 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1118227) |
| v. | |
| DEWIGHT AMADEUS MONDAINE, | |
| Defendant and Appellant. | |

Defendant Dewight Amadeus Mondaine appeals from a judgment of conviction entered after a jury found him guilty of four counts of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c) – counts 1, 2, 3, and 4)[1] and one count of attempted second degree robbery (§§ 211, 212.5. subd. (c), 664 – count 5).  The jury also found true the allegations that defendant used a knife in two of the robberies (counts 2 and 4) and in the attempted robbery (count 5).  In a bifurcated proceeding, defendant admitted prior conviction allegations (§§ 667, subds. (b) – (i), 1170.12, 667, subd. (a), 667.5, subd. (a), 1203, subd. (k), 1203.085, subd. (a)).  The trial court sentenced defendant to 20 years in state prison.  On appeal, defendant contends:  (1) there was insufficient evidence to support the conviction on count 3; (2) the trial court erred when it admitted four videos from his cell phone; (3) the trial court erred when it admitted evidence of uncharged

---

[1]     All further statutory references are to the Penal Code unless otherwise stated.

offenses; (4) the trial court erred when it instructed the jury with CALCRIM No. 375; and (5) he was deprived of the presumption of innocence when the trial court moved him to the end of the defense table and added a bailiff to the courtroom. We find no prejudicial error and affirm the judgment.

## I. Statement of Facts

### A. Robbery of Assenneth Flores (Count 1)

At approximately 9:00 a.m. on Monday, June 27, 2011, Assenneth Flores and Alejandra Valencia, who were employees at the Children's Place in Valley Fair Mall, were taking the store's receipts to the Bank of America for deposit. Flores was carrying the deposit bag, which contained $2,850 in cash and checks. As they walked under the parking structure toward the bank, a man came from behind and tried to tackle Flores. Though Flores resisted, the robber grabbed the deposit bag away from her and fled. Valencia ran after the robber, and Flores ran after her. After the robber escaped, they returned to the store and called the police.

According to Flores, the robber was a male Hispanic or light-skinned African-American, between five feet five inches and six feet tall, and was wearing a black, long-sleeved shirt and black pants. She did not get a good look at his face. The robber had a fade hairstyle that was similar to defendant's hairstyle.

When Valencia was asked whether she recognized the person that she had described in court, she responded, "I believe so." Valencia then identified defendant. She also selected defendant's photograph in a photographic lineup, though she noted that she only saw the robber's profile. She went through the six photographs and chose the one closest to what she thought looked like the robber. She estimated the robber was six feet tall because her boyfriend is six feet one inch tall. However, when defendant stood up, she believed he was "[a] little bit shorter" than her boyfriend.

2

## B.  Robbery of Candace Rudy (Count 2)

At approximately 10:40 p.m. on Saturday, July 30, 2011, Candace Rudy, a salesperson at the ProActiv kiosk in the Oakridge Mall, placed $288 in cash and some change in the deposit bag.  The bank was located in the mall's parking lot.  As she was about to deposit the day's receipts, a man approached her from behind and said, "Excuse me, ma'am."  When she turned around, the man said, "Give me your deposit," and showed her a dagger with a five-inch blade.  She gave him the money and he walked away.  Rudy got into her car, drove home, and called the police.

Rudy could not identify the robber by his face because she had been focusing on the knife.  The robber was an African-American male with a light complexion, which was similar to defendant's complexion, and he was less than six feet tall.  He was wearing a blue and green plaid, long-sleeved shirt and a black baseball cap with a white logo.  The shirt was similar to one later found in defendant's bedroom.

The jury viewed surveillance footage and still photographs from the bank, which showed a man in a plaid shirt and a black hat, who approached Rudy from behind and robbed her.

## C.  Robbery of Ryan Brunmeier (Count 3)

At about 9:30 a.m. on Monday, August 22, 2011, Ryan Brunmeier and Juan Leon, employees at the Hollister store in the Eastridge Mall, were taking a deposit bag containing "just under $10,000," which was "mostly all cash" to the Bank of America.  As they were walking across the parking lot to the bank, a man ran up behind them, "grabbed" the bag out of Brunmeier's hand, and sprinted past them.  According to Brunmeier, the bag was "grabbed pretty forcefully" and he was knocked off balance "a little bit."  Leon heard a "thud" and saw Brunmeier "jerk a little bit forward."  The robber stumbled, but then "took off running."  Both men started to chase after him.  During the

3

pursuit, the robber turned around two or three times and appeared to call someone on a cell phone. When Brunmeier stopped to call the police, Leon continued to run after the robber. The robber ran across the street and behind a building. Leon then saw him get into the front passenger seat of a white Ford Explorer. Brunmeier did not see the robber get into the Explorer, but he did see the vehicle pull out from behind the building and speed away.

The police arrived about five minutes after Brunmeier called them. Brunmeier described the robber to them as "a light-skinned black male or Hispanic." The robber was wearing a plaid, long-sleeved shirt, jeans, sneakers, and a dark blue or black baseball cap. Both Brunmeier and Leon identified the plaid shirt that was found in defendant's bedroom as the shirt worn by the robber. Brunmeier noted that the robber's shirt was very similar to the one that he and Leon were wearing. Brunmeier selected defendant's photograph from a lineup in which his skin tone was the lightest. Both Brunmeier and Leon identified defendant in court as the robber. The jury viewed surveillance footage from mall security cameras that showed a man, who was wearing a plaid shirt and dark hat, following Brunmeier and Leon into the parking lot.

### D. Robbery of Cassie Adler (Count 4)

At about 9:00 a.m. on Tuesday, September 6, 2011, Cassie Adler and Viannay Garcia, who were employees of Off Broadway Shoes in the Plant Shopping Center, were walking to Adler's car in the parking lot. Adler was carrying a deposit bag with approximately $3,400 in cash to the nearby branch of the Bank of America. As Adler approached her car, a man said, "I'm going to need that deposit." Adler opened the car door and threw the deposit into the car. A struggle ensued as the robber tried to enter the car to get the deposit bag. Garcia came around to the driver's side of the car, grabbed the man's shirt, and said, "Stop, she's pregnant." The man hesitated, took out an eight and

4

one-half to nine-inch knife, put it on Adler's arm, and said, "Do you want to get cut?" Garcia pulled Adler away and said, "It's not worth it, stop." The robber entered the car, grabbed the bag, started to walk away, turned around, and said, "Go inside and don't tell anybody and don't scream anymore." Adler and Garcia returned to the store where another employee called 911. Later, Adler noticed that there was a small puncture on her arm.

When the police responded to the scene, Adler described the robber as Hispanic. She was not able to describe his features. She stated that he was wearing blue jeans, and a blue, gray, and white plaid flannel shirt. Adler identified the plaid shirt that was found in defendant's bedroom as the shirt worn by the robber. Adler identified defendant at trial as the robber based on his "[s]tature, buil[d], skin tone, facial features," but she was not "100 percent certain." Garcia testified that there was "no doubt" in her mind that defendant was the robber.

The jury viewed surveillance footage from mall security cameras which showed Adler and Garcia leaving the store and the robbery at Adler's car.

At the time of the robbery, Rafael Meza was sitting in his vehicle in the parking lot of the Plant Shopping Center. Meza saw a man, who was Latino or African-American, run through the bushes. The man was wearing dark pants and a blue plaid shirt. Meza also described the man as "[p]ossibly 35, 40" years old. The man, who had his right hand under his shirt, then entered the back passenger's side seat of a black Toyota.

The jury viewed surveillance footage from the shopping center which showed a man running to a black, four-door vehicle and jumping into the back seat before the car sped away.

## E.  Attempted Robbery of Ivan Maciel (Count 5)

At about 9:00 a.m. on Monday, September 26, 2011, Ivan Maciel and Casey Bargas, who were employees of Vans Store at the Gilroy Outlets, were driving to the drop box for Bank of America to deposit the store's receipts.  The drop box was located in the wall of a room near the restrooms at the mall.  As Maciel was walking into the room with the deposit bag under his arm, a man said, "Give me the bag."  Maciel responded, "What?"  When the man showed him a knife, Maciel panicked, ran to his car, and yelled, "Help."  The man was about five feet six or seven inches and wearing a plaid shirt.  Maciel also described the man as "half African American, maybe half Hispanic or Latino," in his mid-20's, and with "a fade-type" hairstyle.  Maciel was unable to identify defendant in court as the perpetrator, because defendant's mouth was different and his skin was lighter.  However, defendant looked "somewhat" "similar" to the person who had shown him the knife.  Maciel identified exhibit 39 as the type of knife used by the man.  Bargas, who had waited in the car while Maciel went to the drop box, saw a dark-skinned Mexican or light-skinned African-American male.  The man was wearing jeans and a blue, white, and gray plaid, long-sleeved shirt and had a fade hairstyle, and he followed Maciel into the drop box room.  Bargas then heard Maciel yell and saw him run out of the room.  Bargas could not identify defendant as the perpetrator.

Shortly after the attempted robbery, police arrested Darryl Gentry in the area.  Gentry was wearing a black, long-sleeved shirt and had a kitchen knife hidden in his sleeve.  Gentry also had a walkie-talkie and a receipt for an eight-inch chef's knife from Wal-Mart.  Maciel did not identify Gentry as the robber.  According to Maciel, Gentry was "a lot darker" than the robber.

The jury viewed surveillance footage from Wal-Mart showing Gentry, defendant, and a man, who was later identified as Sadat Johnson, exit a white SUV in the parking lot and enter the Wal-Mart.  The video showed Gentry purchasing a chef's knife and then

6

leaving the store with defendant and Johnson at about 8:29 a.m. on the day of the attempted robbery of Maciel. Gentry was wearing the same black, long-sleeved shirt in which he was later arrested. Defendant was wearing a gray tank top, and Johnson was wearing a gray sweatshirt over a white T-shirt.

## F. Police Investigation

Officer Ryan Chan investigated the robberies of mall store employees who were transporting bank deposit bags on Monday mornings. The suspect in these robberies wore a plaid shirt. After Chan learned that a similar robbery had occurred at the Gilroy Outlets and there was a suspect in custody, he obtained the surveillance footage from Wal-Mart. Chan noticed that one of the suspects had a large tattoo on his arm of a barber pole and a pair of scissors. He then reviewed a police database of individuals with distinctive tattoos and identified defendant as one of the suspects. After viewing photographic lineups that included defendant's photograph, some of the victims identified defendant as the perpetrator.

Based on this information, Chan obtained an arrest warrant for defendant and a search warrant for the apartment that he shared with a roommate. Following defendant's arrest, officers searched his bedroom and found a black baseball hat, a blue, white, and gray plaid shirt, and three walkie-talkies. One of the walkie-talkies was paired with the walkie-talkie that Gentry had in his possession when he was arrested after the Gilroy robbery.

Officers also recovered defendant's cell phone, which contained photographs and videos. In the videos, defendant displayed forty $100 bills, repeatedly used a racist term, described himself as an outlaw, and mocked people who work for a living, go to church, and stay in school.

7

Chan later accessed defendant's profile on Facebook. At 12:07 p.m. on June 22, 2011, defendant posted on his Facebook wall: "What else isn't working out for me. Have got shit to show for . . . . Only if people knew how it's in my shoes would they dare to work in them, lol, . . . I don't think so . . . . Now I see the path of destruction is only thing that works for me lol. Faith better come now or forever its [*sic*] going to be looking for me." The first robbery occurred five days later.

## G. Uncharged Offenses

At about 9:50 a.m. on Tuesday, September 4, 2007, Andrea Shields and two other employees of Abercrombie & Fitch at Valley Fair Mall were taking the store's receipts to the Bank of America. As they were walking, someone came up behind Shields, snatched the deposit bag out of her hand, and ran away. There was over $7,000 in the bag. Shields did not see the robber's face. She described him as five feet seven or eight inches tall, with a medium build, dark hair, and a skin tone that was similar to defendant's skin tone. She did not identify defendant in court.

On December 23, 2007, defendant was involved in a motorcycle accident. Police found an eight-inch knife, a black ski mask, and a BB handgun on defendant's motorcycle. They also found defendant in possession of traveler's and personal checks that were dated around September 3, 2007, and made out to Abercrombie & Fitch. The parties stipulated that defendant was convicted on January 18, 2008, of possession of stolen property.

At about 9:00 a.m. on Monday, December 1, 2008, Christina Fernandes, an employee at the Coach store in Stoneridge Mall in Pleasanton, was taking the deposit bag, containing about $4,000 in cash, in her handbag to her car to drive to the bank. As she was walking to her car, a man, whom she identified at trial as defendant, knocked her to the ground. After a struggle, defendant took her handbag and fled. Bystanders chased

8

defendant and he was eventually apprehended.  Fernandes identified defendant at a showup.  The parties stipulated that defendant had been convicted of robbery in connection with this incident.

## H.  Other Evidence

Rosemarie Azcueta was defendant's roommate in October 2011.  About a week before the police searched their apartment, defendant told her about doing "licks" which was slang for robberies.  He told her that he used walkie-talkies and he would "watch his target" before the robberies.  He also told her about a robbery that "went wrong" shortly before their conversation and that someone was arrested in that robbery.  In the same conversation, defendant asked her if she knew where he could get a gun.  When Azcueta learned about the robberies, she told defendant that he could no longer stay there.  However, defendant was arrested before he could move out.  Defendant always paid $300 in cash for rent.

Between August 31 and September 8, 2011, defendant made three purchases in cash that totaled over $3,000 for motorcycle parts.

## I.  Defense Evidence

Defendant testified on his own behalf.  He made his living as a mobile barber and received $15 to $20 for a haircut.  He also received $400 from his parents each month.  He did not own a motorcycle, but he borrowed his friend's motorcycle.  After he was in an accident involving the motorcycle, he bought materials to repair it.  As to the money depicted in the videos, defendant took money he received from his clients and exchanged it for $100 bills so he would not spend it.  He testified that the videos found on his cell phone were made to "show off" for his friends and people on Facebook.  Defendant also explained that his discussion about licks referred to his prior conviction.  Defendant

9

denied committing the charged offenses.  Defendant admitted that he wore a long-sleeved shirt in the 2008 robbery in Pleasanton to cover the tattoos on his arms.

## J. Rebuttal

Officers did not find any $100 bills when they searched defendant's residence or his person.

## II. Discussion

## A. Sufficiency of the Evidence

Defendant contends that there was insufficient evidence to support his conviction of robbery of Brunmeier (count 3), because there was no evidence that the deposit bag was taken by means of force or fear.

When a defendant challenges the sufficiency of the evidence to support a conviction, " ' ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.]  In conducting such a review, we ' "presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citations.]  'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of

10

force or fear." (§ 211.)  Here, since there was no evidence that the taking was accomplished by means of fear, we consider whether there was sufficient evidence of force.

*People v. Burns* (2009) 172 Cal.App.4th 1251 is instructive.  *Burns* recognized that when "a person wrests away personal property from another person, who resists the effort to do so, the crime is robbery, not merely theft." (*Id.* at p. 1257.)  The appellate court explained that the force necessary to establish a robbery " 'must be a quantum more than that which is needed merely to take the property from the person of the victim, and is a question of fact to be resolved by the [trier of fact] taking into account the physical characteristics of the robber and the victim.' [Citation.]  An accepted articulation of the rule is that ' "[a]ll the force that is required to make the offense a robbery is such force as is actually sufficient to overcome the victim's resistance . . . ." ' " (*Id.* at p. 1259.)

Here, Brunmeier testified that he "was hanging on to [the deposit bag] pretty tightly, because it was a large amount of money," and defendant "grabbed it pretty forcefully."  When defendant grabbed the bag, Brunmeier was knocked off balance "a little bit."  Leon testified that "[a]ll of a sudden [he] hear[d] like a thud, and [he saw Brunmeier] jerk a little bit forward," and then he saw defendant stumble in front of him.  Based on the evidence that Leon heard a thud and that Brunmeier was then knocked off balance, the jury could reasonably find that defendant pushed Brunmeier with sufficient force to overcome Brunmeier's resistance.  Thus, there was substantial evidence to support defendant's conviction for robbery on count three.

## B.  Admissibility of Four Videos

Defendant next contends that the trial court abused its discretion by admitting four videos made by defendant.

Prior to trial, defendant brought a motion to exclude evidence of still photographs taken from videos, which were on his cell phone. The photographs showed defendant posing with rolls of money in a bathroom sink. Defendant argued that the photographs were inflammatory and prejudicial under Evidence Code section 352. The trial court denied the motion on the ground that the images were "very relevant to what is alleged to have been taken, which is the proceeds of the robbery."

Defendant later objected when the prosecutor proposed to play one of the videos during her opening statement. The video showed defendant holding $100 bills in his hand, fanning them, and using profanity. The prosecutor argued that the video was probative as to the identity of the robber because it showed that defendant had more money after the robberies than someone in his financial situation should have had. The trial court noted that the two photographs were not very clear and thus the viewer could not determine either the denomination of the bills or how large the stack of bills was. The trial court stated: "[T]his is very probative. We're talking about money that was stolen. That was the fruit of the alleged crime. . . . It needs to be put in context and it needs to clearly be a picture that the jury can see and can judge for themselves."

During trial, defense counsel objected to the prosecutor's playing of four video clips. She argued that the use of "profanity, using the word nigga numerous times" was extremely prejudicial to defendant and the probative value was minimal. The prosecutor argued that the probative value of the videos could not be overstated. The prosecutor also argued that each of the videos contained important statements that were made on the same day. The trial court stated: "I think that the reality is that these are clips that were made in close proximity by the defendant himself. [¶] And the substance of these crimes, the proceeds was money. And if we were to look at a case where it was something else, but it was like the main thing that was taken. In this case it happens to be money. But it would be very, very probative to where I don't feel it is prejudicial. It is a

12

balancing act. And I realize that if it was not probative most evidence is going to be admissible. [¶] It is going to be damaging to your client. It is just a matter of is it that substantially prejudicial, and I don't find that it is."

The parties stipulated that the videos were made on August 25, 2011. The jury viewed the videos, which were four and one-half minutes long, and received transcripts of defendant's statements.

In the first video, defendant stated: "Yo what's up wit' it. This your boy Taz, you feel me? We get money, every day. You understand? We get walk, you understand me? We get money, you understand me? All day. Nigga, it don't stop, you feel me? We shit we, we, we make it rain, you feel me? We make it rain up in here. All day. This nothing, we wash money, you understand me? We wash this shit. Nigga, I got money for days, nigga. You understand me? We get it. And if it's not, then it ain't happening, you feel me? So go ahead, step your game up, and let's get this paper together, you understand me? Yeah."

The second video included the following: "Yo what's up wit it? This your boy Taz, rockin' no face, you feel me? NF, you feel me? You dig? You understand me? We got paper. You understand me? We still got paper. We got more paper than most niggas got in their motherfucking house, nigga, we got more paper than most niggas use to wipe their ass, niggas. All day. If you ain't feeling it, you ain't shouldn't be around this shit. But I get mine. And anybody else that know me knows I do me. Nigga, paper for days, nigga. What other nigga around here be walking like me? None. Y'all niggas is weak, that's why your ass is out on the have no feet, nigga. I get me. Look at that. Paper for days, nigga. All day, nigga. If not, I make it happen nigga, I make it rain, nigga. Might look broke, nigga, but nigga I'm far from broke, nigga. Richest nigga you ever seen, nigga."

13

Defendant stated the following in the third video: "What's up? Your boy No Face. You know what I'm saying? Represent if you see me. Nigga throw it up, nigga. Nigga I got money, nigga. Cash money all day, nigga. (unclear) You can see it, nigga. We got money, nigga, all day. Nigga I don't even want to count this shit so far man I got four fucking racks nigga. Four mamas, nigga. Four racks, nigga. We get money, nigga, we get paper all day, nigga. You ain't knowin? You need to step your game up. This is gonna be one hard ass season for y'all niggas. Nigga, I sweat and shit on these niggas. You ain't knowing? You know what's up now? See me? I'm no face nigga. Straight up, nigga. Black skin nation. We represent to the fullest, nigga. Paper all day, you sucky ass niggas out on the street. You got shit out here, nigga. Straight up nigga, on my mama, nigga[.] Get your shit up, get your weight up, nigga, get your motherfucking pimp game up and your paper shit, nigga. Cause I shit paper, nigga. Four racks, nigga. Y'all niggas ain't having this type of work, nigga. All hundreds, nigga. I get cashed out, nigga, weekly, nigga. Where you at, nigga, on the streets, trying to make a few dollars, nigga? Workin' that nine to five, nigga? We No Face, nigga. We outlaws in this bitch nigga, straight up. Outlaws all day, nigga."

In the fourth video, defendant stated: "On wit' it. This your boy Taz, you feel me? We representin'. You understand? Real outlaws in this motherfucker. You understand me? Nigga. Nigga, I eat, sleep, shit money, nigga, you see this? Nigga? Yeah it don't look like much, huh? Huh yeah? Yeah lemme, lemme, lemme rephrase this. Look at. It's all hundreds, you feel me? Yeah. That's what we do. We fuck with it. We fuck with it tough, you feel me? Niggas ain't knowin'? You need to step your shit up, nigga, you need to get your shit together, nigga. For real deal. Nigga, I ain't even tryin to wait on niggas if you trying to make some money let's get it right, let's get this shit together, nigga. Let's stack, nigga. We got all paper day, nigga, it's paper season, nigga. For real shit, nigga, get your shit together nigga, let's make money. If not,

14

nigga, shut your shit up, nigga, I ain't trying to hear shit.  Nigga, you's a what, you's a bitch, you's a self nigga you's a fucking square.  Stay in church, stay in school, that's where you motherfucking suckers ain't talking about money, that's where you guys belong.  And that's all I got for you.  Other than that, you guys need to just, you know what I'm saying, put together and just make some more money for your boy to stack together.  Nigga, for real shit."

Evidence Code section 352 provides the trial court discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  (Evid. Code, § 352.)  We review the trial court's ruling under Evidence Code section 352 for abuse of discretion. (*People v. Holloway* (2004) 33 Cal.4th 96, 134.)

Relying on *People v. Brumback* (1957) 152 Cal.App.2d 386 (*Brumback*), disapproved of on other grounds in *People v. Weiss* (1958) 50 Cal.2d 535, superseded by statute on another ground as stated in *People v. Griffin* (1991) 235 Cal.App.3d 1740, 1746, defendant argues that the cash images in the videos had no probative value.

*Brumback* recognized that when the denominations of the money stolen are known, possession of currency of those denominations is admissible to show their source if the denominations are not commonly carried.  (*Brumback*, *supra*, 152 Cal.App.2d at p. 392.)  In *Brumback*, $3,200, including twenty $100 bills, was stolen from the victim. (*Ibid.*)  When the defendant and the codefendants were arrested, they had sixty-six $100 bills in their possession.  (*Ibid.*)  The Court of Appeal rejected the defendant's argument that $100 bills were commonly carried and held that the issue was one for the jury to resolve and thus the evidence was admissible.  (*Id.* at pp. 392-393.)

Here, approximately $13,000, most of which was cash, was taken in the three robberies that occurred before the videos were made.  Though there was no evidence as

to the serial numbers or the denominations of the stolen money, we disagree with defendant that the evidence had no probative value. "'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Given defendant's minimal level of employment, his possession of $4,000 had some slight probative value that he obtained the money by committing the robberies.[2]

Defendant next contends that his statements in the videos were not relevant. Defendant stated in a variety of ways that he had a lot of money, but he did not state the source of the money. He did, however, state in exhibit 54: "Y'all niggas ain't having this type of work, nigga. All hundreds, nigga. I get cashed out, nigga, weekly, nigga. Where you at, nigga, on the streets, trying to make a few dollars, nigga? Workin' that nine to five, nigga? We No Face, nigga. We outlaws in this bitch nigga, straight up. Outlaws all day, nigga." Thus, though he contrasts his line of work with those who work "nine to five" and specifically refers to himself as an outlaw, there was no evidence that he was committing robberies on a weekly basis. Given the very vague nature of defendant's references, these statements only minimally, if at all, supported the inference that the bills he displayed were the proceeds of the robberies.

Defendant also argues that even if his possession of money and his claim to be an "outlaw" were relevant, showing all four videos was cumulative. We need not consider this issue because we conclude the very slight probative value of the evidence was substantially outweighed by the probability that its admission would create substantial danger of undue prejudice.

---

[2] Defendant argues that the testimony as to the amount was based solely on the deposit slips and thus inadmissible hearsay. However, defendant has forfeited his objection to the evidence on this ground by failing to raise it at trial. (*People v. Eubanks* (2011) 53 Cal.4th 110, 142.) He also argues that the testimony was not based on personal knowledge. Defendant has forfeited this objection for the same reason. (*People v. Lewis* (2001) 26 Cal.4th 334, 357.)

The "undue prejudice" referred to in Evidence Code section 352 "is not synonymous with 'damaging,' but refers instead to evidence that '"uniquely tends to evoke an emotional bias against defendant"' without regard to its relevance on material issues." (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.) This "'"evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citations.]'" (*People v. Scott* (2011) 52 Cal.4th 452, 491 (*Scott*).)

In the present case, the language used by defendant in the videos is extremely offensive. For four and one-half minutes, the jurors heard the word "nigga" 79 times. The use of racial epithets is not unduly prejudicial when it is relevant to a material issue in the case. (*People v. Quartermain* (1997) 16 Cal.4th 600, 628 [defendant's use of racial epithets on three occasions in referring to murder victim was relevant to the issue of motive].) However, here, defendant's incessant use of "nigga" was not relevant to any issue. Defendant also used 32 examples of profanity. In addition to the inflammatory language, defendant disparaged those who work "nine to five," or "[s]tay in church" or "stay in school," that is, the very groups to which the members of the jury most likely belonged. Thus, the evidence was "'"of such nature as to inflame the emotions of the jury,"'" and there was a "'"substantial likelihood"'" that the jury would improperly use it to punish defendant. (*Scott*, *supra*, 52 Cal.4th at p. 491.)

Relying on *People v. Holford* (2012) 203 Cal.App.4th 155, the Attorney General argues that the probative value of the videos was not substantially outweighed by its prejudicial effect. *Holford* is distinguishable from the present case. In *Holford*, the defendant was charged with possession of pornography. (*Id.* at p. 158.) In rejecting the

17

defendant's argument that the video on his hard drive depicting child pornography was unduly prejudicial under Evidence Code section 352, *Holford* found that the evidence "*was the crime*," and thus its probative value was high. (*Id.* at p. 171.) Here, as previously stated, the probative value of the videos was minimal.

In sum, the four videos had minimal probative value that was substantially outweighed by their prejudicial effect. Accordingly, we conclude that the trial court abused its discretion in admitting this evidence.

The erroneous admission of evidence constitutes reversible error only if it resulted in a miscarriage of justice. (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b).) A reviewing court should declare a miscarriage of justice only when the court concludes it is reasonably probable the defendant would have obtained a more favorable result in the absence of the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

In the present case, the evidence against defendant was overwhelming. Five days before the first robbery, defendant posted on Facebook that "the path of destruction is the only thing that works for me." All of the charged offenses then occurred as mall store employees took their store's deposits to the bank. Valencia, Brunmeier and Leon, and Garcia, the victims in three of the robberies (counts 1, 3, and 4) identified defendant in court and in photographic lineups as the robber. All of the victims provided similar descriptions of defendant, that is, a male Hispanic or light-skinned African-American, between five feet five inches and six feet tall, and wearing a long-sleeved shirt. The robber wore a plaid shirt in three of the robberies (counts 2, 3, and 4), which the victims testified was similar to the one found in defendant's bedroom. The robber also wore a plaid shirt in the attempted robbery (count 5). According to Flores and Maciel (counts 1 and 5), the robber had a fade hairstyle, which is the type of hairstyle that defendant had. Though Rudy did not identify defendant as the robber, the jury viewed surveillance footage of the robbery (count 2) and the robber was wearing a black hat and plaid shirt

18

similar to the one later found in defendant's bedroom. Maciel also did not identify defendant as the perpetrator of the attempted robbery (count 5). However, shortly after the attempted robbery, Gentry was arrested in the area. Gentry did not match the description of the robber and Maciel denied that he was the individual who had attempted to rob him, but Gentry had in his possession a knife that had been purchased earlier that day when he was with defendant at Wal-Mart. The knife was the type of knife used in the attempted robbery of Maciel. Gentry also had a walkie-talkie that paired with one found in defendant's bedroom. Moreover, shortly before he was arrested, defendant admitted to his roommate that he had recently committed robberies, discussed casing his targets and using walkie-talkies, and stated that a recent robbery had failed and an accomplice was arrested. Defendant also paid his rent and over $3,000 to repair his friend's motorcycle during this period despite his minimal level of employment. In addition, defendant had two prior convictions arising out of incidents in which mall store employees were robbed as they took their store's deposits to the bank. Based on this evidence, it is not reasonably probable that defendant would have been acquitted if the evidence of the four videos had been excluded.[3]

Defendant contends that *Chapman's* "beyond a reasonable doubt" standard of review applies because the error deprived him of a fair trial. (*Chapman v. California* (1967) 386 U.S. 18, 24.) He relies upon *McKinney v. Rees* (9th Cir. 1998) 993 F.2d 1378 (*McKinney*) and *United States v. Enzor* (5th Cir. 1987) 820 F.2d 684 (*Enzor*). However,

---

[3] In emphasizing the prejudicial nature of the error, defendant argues that the video evidence "took a substantial fraction of the time necessary for testimony about any given count." One of the videos was played during the prosecutor's opening statement and the four videos were played at the end of her case-in-chief, thus this evidence consumed at most five and a half minutes over five days of testimony. He also argues that the prosecutor exploited the error during argument. However, the prosecutor did not refer to the prejudicial nature of the videos. Instead, she focused on defendant's possession of a large amount of cash despite his meager earnings and his cash expenditures for rent and motorcycle repairs.

*McKinney* establishes that "'[o]nly if there are *no* permissible inferences the jury may draw from the evidence [of other acts] can its admission violate due process.' [Citation.]" (*McKinney*, *supra*, 993 F.2d at p. 1384; accord *Enzor*, *supra*, 820 F.2d at p. 686.) Thus, this court must decide whether the evidence is "'"of such quality as necessarily prevents a fair trial."' [Citations.]" (*McKinney*, at p. 1384.) In *McKinney*, the defendant was charged with killing his mother with a knife that was never found. A large quantum of evidence (more than 60 pages of testimony) about his "fascination" with his "knife collection" and with death was introduced at trial. (*Id.* at pp. 1382, 1385-1386.) The Ninth Circuit held that the admission of such "emotionally charged" evidence violated due process because there were no permissible inferences that could be drawn from it, and it formed a significant part of the prosecution's case, which was entirely circumstantial. (*Id.* at p. 1385.) In *Enzor*, the defendant, a prison inmate, was charged with falsely altering money orders. (*Enzor*, at p. 685.) The Fifth Circuit held that the admission of testimony by the postal inspector of the number of prosecutions and convictions of a prison money order scam, which did not involve the defendant, was "entirely unrelated to his case," and thus violated the defendant's due process rights. (*Id.* at p. 686.) In contrast to *McKinney* and *Enzor*, here, there was a permissible inference that could be drawn from defendant's possession of a large amount of cash shortly after the robberies and the videos did not form a significant part of the prosecution's case.

Defendant's reliance on *People v Sherrod* (1997) 59 Cal.App.4th 1168 (*Sherrod*) is also misplaced. In *Sherrod*, the trial court granted the defendant's motion for a new trial after concluding that it had erred in failing to continue the original trial. (*Id.* at p. 1170) The Court of Appeal held that the trial court did not abuse its discretion in ordering a new trial, because the defendant was not given an adequate time and opportunity to prepare for trial, and thus had been denied a fair trial. (*Id.* at p. 1175.) It was in this context that *Sherrod* stated that "the denial of a fair trial, in and of itself,

20

results in a miscarriage of justice, whether or not the defendant meets the *Watson* standard of prejudicial error. [Citations.]" (*Id.* at pp. 1174-1175.) No such error has occurred in the present case.

In sum, we conclude the erroneous admission of the four videos was not prejudicial.


## C. Admissibility of Other Crimes Evidence

Defendant next contends that the trial court abused its discretion under Evidence Code sections 1101 and 352 when it admitted evidence of two uncharged offenses.

### 1. Background

Prior to trial, defendant brought a motion to exclude this evidence and argued that there were insufficient similarities between the charged and uncharged offenses. Defendant did not summarize the facts of either type of offenses other than to state that the perpetrator in counts 1 through 5 wore a long-sleeved shirt.

The prosecutor brought a motion to present evidence that defendant had committed two prior robberies to prove identity, motive, and common scheme or plan. In her motion, the prosecutor asserted that the perpetrator of the charged offenses: (1) targeted employees of businesses in shopping malls on their way to make bank deposits; (2) watched his victims to determine their practice in making these deposits; (3) wore a long-sleeved shirt; and (4) forcibly took the money from the victims. Defense counsel did not object to this characterization of the evidence.

As to the uncharged offenses, the prosecutor sought to introduce the testimony of Fernandes that, at around 9:00 a.m. on December 1, 2008, she was carrying the deposit bag in her purse from the Coach store in Stoneridge Mall to her car to drive to the nearby Bank of America. Defendant, who was wearing a long-sleeved shirt, ran up to her from behind, yanked her purse, including the $4,000 deposit, and caused her to fall to the

21

ground. Defendant then fled on a motorcycle. After he was detained by two witnesses, Fernandes positively identified him. Surveillance footage showed that defendant walked around the mall for 10 minutes and followed Fernandes when she left the store. Defendant was later convicted of second degree robbery.

The prosecutor also sought to present testimony from Shields that on September 4, 2007, she and two coworkers were taking a bank bag containing over $4,000 to make a deposit at the Bank of America. A man with a dark complexion ran up to her from behind and grabbed the bag so forcefully that she lost her balance. On December 27, 2007, police stopped defendant for driving recklessly on his motorcycle and found the proceeds of the robbery, a black ski mask, and a kitchen knife. Defendant was convicted of possession of stolen property.

After the trial court denied defendant's motion pursuant to section 995 and the parties discussed the amendment of the information, the prosecutor briefly discussed the motion pursuant to Evidence Code section 1101. The following exchange then occurred: "[Defense Counsel]: Your honor, as well I would submit on my responses which is an objection to the 1101 B evidence under 352. [¶] And just to put on the record also, that the three of us, the court, prosecutor and myself, did have approximately two hours or more discussion in chambers regarding these issues. We did spend quite a bit of time discussing the pros and cons. Based on that, I would submit on the motion. [¶] The Court: I just want to make sure that I extend the invitation to supplement the record in any way that you would like as the discussions in chambers were not on the record. So if either one of you would like to supplement the record, you're welcome to. [¶] [Defense Counsel]: Thank you, your honor, but, no, I would just submit at this time." In deciding whether to allow the prosecutor to introduce evidence of uncharged offenses, the trial court stated that it found the following shared marks: (1) casing the stores to determine which employees made the bank deposits; (2) following these employees as they left the

22

stores to make the deposits; (3) the robberies occurred in the morning when there were few customers or when the store had not yet opened; (4) the perpetrator wore a long-sleeved shirt; (5) the perpetrator approached the victim from behind and snatched the money bag or purse; (6) the perpetrator left on a motorcycle; and (7) the perpetrator used a kitchen knife. The trial court concluded that the probative value of the uncharged offenses was not substantially outweighed by its prejudicial effect and found that evidence was admissible to prove identity, common scheme or plan, and motive.[4]

## 2. Analysis

"'Subdivision (a) of [Evidence Code] section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of [Evidence Code] clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition.' [Citation.] 'Evidence that a defendant committed crimes other than those for which he is on trial is admissible when it is logically, naturally, and by reasonable inference relevant to prove some fact at issue, such as motive, intent, preparation or identity. [Citations.]'" (*People v. Fuiava* (2012) 53 Cal.4th 622, 667 (*Fuiava*).)

"'"[O]ther-crimes evidence is admissible to prove the defendant's identity as the perpetrator of another alleged offense on the basis of similarity 'when the marks common to the charged and uncharged offenses, considered singly or in combination, logically operate to set the charged and uncharged offenses apart from other crimes of the same general variety and, in so doing, tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses.' [Citation.]" [Citation.] The

---

[4] Though the trial court found that the evidence was admissible to prove motive, the jury was not instructed that it could consider the evidence for this purpose.

inference of identity, moreover, need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.' [Citation.]" (*People v. Vines* (2011) 51 Cal.4th 830, 856-857 (*Vines*), superseded by statute on another point as recognized in *People v. Robertson* (2012) 208 Cal.App.4th 965, 981; see also *People v. Kipp* (1998) 18 Cal.4th 349, 369-370.) A lesser degree of similarity is required to establish the existence of a common plan: "'the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual . . . .' [Citation.]" (*People v. Ewards* (2013) 57 Cal.4th 658, 712.)

"'When reviewing the admission of evidence of other offenses, a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant. [Citation.]'" (*Fuiava*, *supra*, 53 Cal.4th at p. 667.) Moreover, the probative value of the uncharged offense must be weighed against the danger "of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

"'"We review for abuse of discretion a trial court's rulings on relevance and admission or exclusion of evidence under Evidence Code sections 1101 and 352." [Citation.]' [Citation.]" (*Fuiava*, *supra*, 53 Cal.4th at pp. 667-668.)

Here, identity was a material fact that the prosecutor was required to prove. The trial court referred to several marks common to the charged and uncharged offenses: (1) casing the stores to determine which employees made the bank deposits; (2) following these employees as they left the stores to make the deposits; (3) the robberies occurred in the morning when there were few customers or when the store had not yet opened; (4) the perpetrator wore a long-sleeved shirt; (5) the perpetrator approached the victim from behind and snatched the money bag or purse; (6) the perpetrator left on a motorcycle; and

24

(7) the perpetrator used a kitchen knife. These common marks " " " "tend to suggest that the perpetrator of the uncharged offenses was the perpetrator of the charged offenses' " " " (*Vines*, *supra*, 51 Cal.4th at p. 857), and thus the evidence was highly probative. Moreover, the evidence was not unduly prejudicial under Evidence Code section 352. Accordingly, the trial court did not abuse its discretion in admitting evidence of the uncharged offenses.

Defendant focuses on each common mark that the trial court referred to in its ruling and argues that its findings of similarity between the uncharged and charged offenses were not supported by the record. To support his argument, he cites to the evidence presented at trial. However, a challenged ruling involving a trial court's exercise of discretion is reviewed on the basis of the facts known to the trial court when its ruling was made. (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1007-1008, fn. 23.) In response to this court's request for supplemental briefing as to whether defendant "provided an adequate record to permit review of this issue or has it been forfeited," defendant argues that "[t]he existing record establishes those facts and [his] challenge is not based on any factual dispute that may or may not have been presented in chambers." He argues that "the trial court stated no factual basis for admissibility not stated in the moving papers. Therefore, there is no reason to speculate on the in-chambers discussion." We disagree with defendant's characterization of the record.[5]

---

[5]     Relying on *People v. Cardenas* (2007) 155 Cal.App.4th 1468, 1483 (*Cardenas*), and *People v. Bracey* (1994) 21 Cal.App.4th 1532, 1542 (*Bracey*), defendant also argues that "[a]s the factual findings and legal reasoning are the elements of the judge's discretionary ruling relevant to review [citation], the in-chambers discussion is irrelevant." Both cases are inapposite. In determining whether the trial court properly sentenced the defendant, *Cardenas* stated that a reviewing court "review[s] the trial court's reasons." (*Cardenas*, at p. 1483.) *Bracey* held that its "review of the order of dismissal under section 1385 is limited to the reasons stated by the trial court." (*Bracey*, at p. 1542.) There was no issue in either case of in-chambers discussions.

"[O]n appeal a judgment is presumed correct, and a party attacking the judgment, or any part of it, must affirmatively demonstrate prejudicial error." (*People v. Garza* (2005) 35 Cal.4th 866, 881.) Here, since the trial court's statement includes common marks that were not supported by the facts presented in the parties' motions, this court must presume that additional facts regarding the charged and uncharged offenses were provided to the trial court in chambers. Accordingly, we reject defendant's argument.

Alternatively, defendant contends that his counsel rendered ineffective assistance. "To prevail on a claim of ineffective assistance of counsel, a defendant ' "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." [Citation.] A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. [Citation.]' " (*People v. Maury* (2003) 30 Cal.4th 342, 389.)

Here, defense counsel could have made a reasonable tactical choice not to supplement the record on the ground that the facts as presented by the parties in chambers demonstrated that the evidence of the uncharged offenses was admissible. (See *People v. Prieto* (2003) 30 Cal.4th 226, 261.) Moreover, defendant has failed to show prejudice. Even if some of the trial court's findings as to common marks were not supported by the record, there were sufficient marks to support the trial court's ruling. The prosecutor asserted that the perpetrator of both the charged and uncharged offenses targeted employees of businesses in shopping malls on their way to make bank deposits. While the prosecutor explicitly stated that the perpetrator of the charged offenses watched his

26

victims to determine their practice in making these deposits, the facts of the uncharged offenses indicated that defendant did so as well. It simply could not have been a coincidence that defendant robbed these individuals when they were carrying the stores' deposits to the bank. The two uncharged offenses and four of the five charged offenses occurred in the morning. The prosecutor's proffer of one of the uncharged offenses indicated that defendant wore a long-sleeved shirt as did the perpetrator of the charged offenses. The perpetrator in the uncharged offenses approached his victims from behind as did defendant in the uncharged offenses. Given these common marks, there was sufficient evidence to support the trial court's exercise of its discretion.

### D. CALCRIM No. 375

Defendant argues that the trial court improperly instructed the jury with CALCRIM No. 375, because it is argumentative and thus deprived him of due process and a fair trial. He focuses on the following language: "The People presented evidence that the defendant committed prior robberies that were not charged in this case. [¶] You may consider this evidence . . . [¶] . . . [¶] . . . for the . . . purpose of deciding whether or not: [¶] The defendant was the person who committed the offenses alleged in this case . . . ."

An argumentative instruction "'invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence.' [Citations.]" (*People v. Mincey* (1992) 2 Cal.4th 408, 437.) We review the legal correctness of jury instructions de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Defendant's argument fails because he has omitted portions of CALCRIM No. 375. Here, the trial court gave the following instruction after closing arguments: "The People presented evidence that the defendant committed prior robberies that were not charged in this case. [¶] You may consider this evidence only if the People have proved

27

by a preponderance of the evidence that the defendant in fact committed the uncharged offenses or acts. Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true. [¶] If the People have not met this burden, you must disregard this evidence entirely. [¶] If you decide that the defendant committed the uncharged offenses or acts, you may, but are not required to consider that evidence for the limited purpose of deciding whether or not the defendant was a person who committed the offenses alleged in this case or the defendant had a plan or scheme to commit the offenses alleged in this case. [¶] In evaluating the evidence, consider the similarity or lack of similarity between the uncharged offenses and the acts and the charged offenses. [¶] Do not consider this evidence for any other purpose, except for that limited purpose of determining the defendant's credibility. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime. [¶] If you conclude that the defendant committed the uncharged offenses or acts, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of robbery or attempted robbery or of the allegation of personal use of a weapon. The People must still prove each charge and allegation beyond a reasonable doubt."[6]

CALCRIM No. 375, as given in the present case, was not argumentative. It did not invite the jury to draw inferences favorable to the prosecution. Its purpose was to protect defendant from improper inferences. When considered as a whole, CALCRIM No. 375 properly instructs the jury that it can, but was not required to, consider uncharged offenses for a specified limited purpose. (See *People v. Ghent* (1987) 43 Cal.3d 739, 759-760.) Moreover, the trial court instructed the jury six times that the

---

[6] The trial court also gave a nearly identical instruction before the prosecutor introduced evidence of the uncharged offenses.

prosecution was required to prove defendant's guilt of each element of the charged offenses beyond a reasonable doubt. Thus, we conclude that when the trial court instructed the jury with CALCRIM No. 375, defendant was not deprived of due process and a fair trial.

### E. Security Measures

Defendant also contends that he was deprived of due process and a fair trial, because the trial court moved him to the end of the defense table and added a bailiff to the courtroom. Defendant argues that these security measures were inherently prejudicial because they indicated that his "only ally ha[d] cast him away, and the jury [could not] therefore but help regarding him with suspicion and fear." He also asserts that separating him from his counsel "was the equivalent of putting him on display in the dock."

### 1. Background

On the third day of trial, defense counsel found an "over sized thumb tack" on her chair when she returned from the morning recess. The tack was not on the chair when defendant entered the courtroom and sat down next to defense counsel. However, the tack appeared after defense counsel stood up for the jury's entrance and before she sat down. According to defense counsel, she was "very discreet" and gave it to the bailiff. She did not think that the jurors saw the tack because she was facing the bailiff, not the jurors. The trial court specifically informed defendant that it was not accusing him of placing the tack on the chair. However, the trial court and defense counsel agreed that defendant would move to the end of the defense table. The trial court stated that it was "concerned for everyone's safety," that it wanted "to make sure that [defendant had] a fair and impartial trial," and that moving him a few feet from his counsel was the "least intrusive" way of addressing the security issue. The trial court also asked defense counsel whether there was a reason to instruct the jury. Defense counsel responded that

29

an instruction was unnecessary and she would place several binders in the area to create the impression that they needed a "bigger work space."

After the incident, the prosecutor contacted the jail regarding defendant's custodial status. She was informed that defendant was being housed in a less secure facility than he should have been and that he would be reclassified. When defendant was informed that he was being reclassified, he became "extremely agitated" and "repeatedly yell[ed], it was just a thumb tack; it was just a thumb tack." He also made statements to the effect of "Why would I sabotage my own case."

Two days later, the trial court conducted an in camera hearing. Defense counsel denied that separating her from defendant affected her "ability to represent" defendant or their "attorney-client relationship." Defense counsel also denied that the situation had affected her defense strategy, her ability to communicate with defendant, or that she was afraid of sitting next to defendant. However, defendant expressed his concerns: "I've been punished for something that I did not do. [¶] I feel that I am being prejudiced for, those are being prejudiced against me because now I have to face the jury when I'm normally sitting on the front side [of counsel table]. [¶] We have extra deputies in here which I feel uncomfortable and knowing that the jury sees the additional security make me look even worse than what I'm being charged for."[7]

## 2. Analysis

We review the trial court's decision to employ a security measure under the abuse of discretion standard. (*People v. Hernandez* (2011) 51 Cal.4th 733, 741 (*Hernandez*).)

"Trial courts possess broad power to control their courtrooms and maintain order and security. [Citation.]" (*People v. Woodward* (1992) 4 Cal.4th 376, 385.) "Many

---

[7] Defendant's reference to additional security is the only support for the assertion in his briefs that an additional bailiff was assigned to the courtroom for the remainder of the trial. We will assume that one additional officer was present in the courtroom after the tack was found.

30

courtroom security procedures are routine and do not impinge on a defendant's ability to present a defense or enjoy the presumption of innocence. [Citation.]" (*Hernandez*, *supra*, 51 Cal.4th at p. 741.) Thus, the California Supreme Court has recognized that these routine procedures, including the use of metal detectors at the entrance to the courtroom, the placement of a partition and bars separating the spectators from the court area, the stationing of law enforcement officers in the courtroom, and the placement of an armed officer directly behind the defendant when he testified, are "not inherently prejudicial." (*People v. Stevens* (2009) 47 Cal.4th 625, 634, 638.) As the *Stevens* court noted, "That a security practice seems to focus attention on the defendant is not enough, without more, to render the practice inherently prejudicial." (*Id.* at p. 638.) Courts have upheld these procedures as long as the trial court has "exercise[d] its own discretion to determine whether a given security measure is appropriate on a case–by–case basis." (*Id.* at p. 642.)

"However, some security practices inordinately risk prejudice to a defendant's right to a fair trial and must be justified by a higher showing of need. For example, visible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community. [Citations.] Because physical restraints carry such risks, their use is considered inherently prejudicial and must be justified by a particularized showing of manifest need. [Citations.]" (*Hernandez*, *supra*, 51 Cal.4th at p. 742.) The practice of requiring a defendant to wear prison clothing during trial is also considered inherently prejudicial because "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." (*Estelle v. Williams* (1976) 425 U.S. 501, 504-505.)

Here, the trial court's placement of defendant at the end of the defense table was not inherently prejudicial. Defense counsel was confident that the jury was unaware that

31

a tack had been placed on her chair. Thus, the jury would not have been able to attribute the move to this fact and then speculate about defendant's involvement. As defense counsel noted, it was also unlikely that the jury would have even noticed the move since she placed several binders in the area to indicate that they needed a "bigger work space." Moreover, defendant was not restrained, remained seated at the defense table, and was seated close enough to his counsel to communicate with her and to assist in his defense.

Nor was the assignment of an extra bailiff to the courtroom in conjunction with defendant's move inherently prejudicial. " '[T]he presence of guards at a defendant's trial need not be interpreted as a sign that [defendant] is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm. [Citation.]' " (*People v. Jenkins*, *supra*, 22 Cal.4th at p. 996, quoting *Holbrook v. Flynn* (1986) 475 U.S. 560, 569.) Here, there is no indication in the record that either bailiff was positioned near defendant after he was moved or that the type of weapons in their possession had changed. Under these circumstances, the jury could not have inferred that defendant was "particularly dangerous or culpable." Accordingly, the security measures, in combination, were not inherently prejudicial.

Defendant characterizes the placement of the tack as a "childish prank" and "annoying," and thus he claims that there was no need to institute any security measures. We disagree. The placement of the tack on defense counsel's chair indicated some

32

hostility toward her.  Had she not noticed the tack, she could have been injured.  As the trial court noted, it had a responsibility to ensure the safety of everyone in the courtroom.  Though the trial court expressly stated that it was not accusing defendant of placing the tack on the chair, circumstantial evidence indicated that he had done so.  The trial court also stated its reasons for adopting the minimally intrusive security measures and assured defendant that it intended to ensure that he received a fair trial.  Thus, the trial court did not abuse its discretion in moving defendant and adding a bailiff to the courtroom.

## F.  Cumulative Error

"'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.' [Citation.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  We have concluded that there was error in the admissibility of the evidence of the four videos, but found it harmless.  Therefore, defendant's contention that the cumulative effect of the errors was prejudicial has no merit.

## III.    Disposition

The judgment is affirmed.

33

_____
Mihara, J.

WE CONCUR:

_____
Premo, Acting P. J.

_____
Grover, J.